RACHEL GEORGE TERRY (10769)
MICHAEL J. TETER (16734)
Assistant Utah Attorneys General
SEAN D. REYES (7969)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Facsimile: (801) 366-0101
E-mail: rachelterry@agutah.gov
        mteter@agutah.gov

*Attorneys for Jordan School District, Granite School District, Canyons School District, Patrice Johnson, Martin Bates and James Briscoe*

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| S.G., by and through her general guardian, BRENT GORDON; L.D., by and through her general guardian, JASON DIXON; B.S., by and through her general guardian, LISA SIMMONS; M.C., by and through her general guardian, BARBARA CALCHERA; D.R., by and through her general guardian, BRET ROBISON; I.N., by and through her general guardian, MANUEL NOGALES, individually and on behalf of all those similarly situated,<br><br>                                Plaintiffs,<br><br>v.<br><br>JORDAN SCHOOL DISTRICT, GRANITE SCHOOL DISTRICT, CANYONS SCHOOL DISTRICT, UTAH HIGH SCHOOL ACTIVITIES ASSOCIATION, INC., PATRICE JOHNSON, MARTIN BATES, and JAMES BRISCOE,<br><br>                                Defendants. | **DISTRICTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO CONDUCT SURVEY OF FEMALE STUDENTS' INTEREST IN FOOTBALL**<br><br><br>Case No. 2:17-CV-00677-RJS-DBP<br><br>Judge Robert J. Shelby<br>Magistrate Judge Dustin B. Pead |

Defendants Jordan School District, Granite School District, and Canyons School District ("Districts"), by and through counsel Rachel G. Terry and Michael J. Teter, Assistant Utah Attorneys General, respectfully submit this Memorandum in Opposition to Plaintiffs' Motion to Conduct Survey of Female Students' Interest in Football. (Doc. 131)

## INTRODUCTION

Plaintiffs seek a court order allowing them access to every female high school student in the Districts' schools to conduct a survey to assess those students' interest and ability to play football. They base their Motion on guidance from the U.S. Department of Education's Office for Civil Rights (OCR). But their proposed survey does not comport with OCR guidance, nor with industry practices for surveys. Further, the proposed administration is flawed and would unnecessarily encroach on student privacy interests, statutory protections, and the deference courts owe to school administrators.

Plaintiffs rejected the Districts' offer to work with them to create a meaningful and effective survey instrument. They stated that they did not want to collaborate with the District because they had a different purpose in mind. And it is clear that Plaintiffs designed their survey – unabashedly so – to accomplish their litigation objectives.

Any survey, even a methodologically sound one, will be invasive and take time away from classroom instruction. Thus, any survey must be as efficient and effective as possible. Districts have developed a sound survey that will appropriately measure student interest across a range of athletics.[1] Therefore, the Court should deny Plaintiffs' Motion.

---

[1] Districts began the process of identifying a survey company in the summer of 2018 and selected a company, Y2 Analytics, LLC, in the fall of 2018. Y2 Analytics is a general-purpose scientific research firm that focuses on creating and administering unbiased surveys. The company has

**ARGUMENT**

**I.     TITLE IX DOES NOT REQUIRE A FORMAL WRITTEN SURVEY**

In the Motion, Plaintiffs assert that Districts have not assessed student interest for "decades" and that OCR has provided direction that formal surveys are "vital to compliance with Title IX."[2] Plaintiffs are wrong. While formal written surveys may be useful in assessing student interest if done in a scientifically valid manner, Title IX does not require such surveys and courts have found that they are not necessary for compliance with Title IX.

In *Ollier v. Sweetwater Union High School District*, the court stated that "a specific survey or assessment of interest and abilities is not required by the Title IX regulation or the Policy Interpretation" and that other indicators "such as club and intramural sports, sports programs at 'feeder' schools, community and regional sports programs and physical education classes may provide a basis for assessing unmet interest and ability." 604 F. Supp. 2d 1264, 1274 (S.D. Cal. 2009), *aff'd,* 768 F.3d 843 (9th Cir. 2014) (citing *Cohen v. Brown*, 101 F.3d 155, 180 (1st Cir.1996)). Similarly, in *Wieker v. Mesa County Valley School District*, the court held "Title IX does not require the District to conduct formal interest surveys." No. CIVA05-CV-806, 2007 WL 595629, at *7 (D. Colo. Feb. 21, 2007); *see also Mansourian v. Board of Regents of University of California at Davis*, 816 F. Supp. 2d 869, 929 (E.D. Cal. 2011) (indicating that informal monitoring of "interest and abilities through analysis of participation in club sports and intramurals" satisfied assessments of interests under Title IX).

---

experience surveying K-12 school district patrons and students. Districts have included a copy of a draft survey prepared by Y2 Analytics. *See* Ex. 1.
[2] Pls.' Mot. at 4 (Doc. 131).

Title IX does not mandate that intuitions conduct formal surveys because Title IX recognizes the importance of allowing institutions to develop "their own assessment methods that retain the flexibility to meet their unique circumstances" and that institutions are free to conduct their assessments however they see fit so long as they are "consistent with the nondiscrimination requirements of the Title IX." OCR, INTERCOLLEGIATE ATHLETICS POLICY CLARIFICATION: THE THREE PART TEST – PART THREE ("2010 Clarification") at 2; *see also Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) ("[w]e are a society that cherishes academic freedom and recognizes that universities deserve great leeway in their operations. . . . Title IX does not require institutions to fund any particular number or type of athletic opportunities—only that they provide those opportunities in a nondiscriminatory fashion").

OCR lists formal surveys as just one of seven non-exhaustive ways intuitions may assess student interest. *See* 2010 Clarification at 6. Other potential methods of assessment include participation rates in club or intramural sports, participation in interscholastic sports by future students, participation rates in sports in amateur athletic association and community sports leagues that operate in areas from which the institution draws its students, and interviews with students, coaches, administrators, and others regarding interests in particular sports. *Id.* Therefore, despite Plaintiffs' suggestion that a formal written survey is required under Title IX, Districts are under no such obligation.[3]

---

[3] In fact, Plaintiffs' citation to Washington State's administrative code proves the point since a state law mandating student surveys would not be necessary if Title IX required districts to conduct such surveys. In addition, Washington's law requires the State Superintendent of Public Instruction to develop the survey and commands that districts administer *that* survey and seek approval to make any changes to the survey instrument. *See* Wash. Admin. Code § 392-190-040. Washington's approach (cited approvingly by Plaintiffs) requiring a standard survey devised by the State Superintendent of Public Instruction following OCR guidance and administered

3

Notwithstanding the above, Districts have decided that a properly conducted, scientifically valid survey could be useful as one of the ways Districts assess student interest under Title IX.[4] Each district is entitled to develop its own assessment methods that retain the flexibility to meet their unique circumstances. Plaintiffs cite no authority even suggesting a group of students can force three separate school districts to conduct a self-interested survey about one particular sport. Indeed, such a survey would violate the principle of academic freedom recognized in Title IX and its regulations. *See e.g., Cohen*, 991 F.2d at 906. Therefore, Plaintiffs' motion should be denied.

## II. PLAINTIFFS' PROPOSED SURVEY FAILS TO CONFORM WITH OCR GUIDANCE AND PROFESSIONAL SURVEY STANDARDS

### A. Plaintiffs' Proposed Survey Disregards OCR Guidance

OCR recognizes only a "properly designed and implemented survey" as a tool to assess students' interests and abilities.[5] Even as Plaintiffs rely on OCR guidance to persuade the Court to grant them authority to survey female students' interest in football, Plaintiffs propose a survey that would not satisfy OCR guidance as an appropriate and legitimate survey instrument.

---

uniformly across the State, is the antithesis of what Plaintiffs seek in their motion, which would allow a group of students to devise and administer a survey in three Districts' schools.

[4] "OCR evaluates a survey as *one component of an institution's overall assessment* under Part Three [full and effective accommodation]", "[i]f an institution conducts a survey as part of its assessment, OCR examines the content, implementation and response rates of the survey, *as well as an institution's other methods of measuring interest and ability*." *See* 2010 Clarification at 8 (emphasis added).

[5] Pls.' Mot., Ex. A at 9 (Doc. 131-1).

4

OCR provided specific guidance about the content of surveys. For example, OCR stated that it evaluates whether a survey clearly states its purpose. To assist schools in articulating a valid purpose, OCR offered:[6]

> **Purpose:** This data collection is being conducted for evaluation, research, and planning purposes and may be used along with other information to determine whether [Institution] is effectively accommodating the athletic interests and abilities of its students, including whether to add additional teams.

Plaintiffs' proposed the following purpose:[7]

> The purpose of this survey is to find out how many girls at your high school would play tackle football on all-girl's teams if your school offered girl's football teams. If enough girls want to play football, your high school would be required to offer girl's football teams. Your responses will remain anonymous and confidential. Only the survey results of all students as a whole will be shared.

OCR also "evaluates whether the survey lists all sports…and contains an open-ended inquiry for other sports to allow students to write in any sports that are not listed…[and] allows students to provide additional information or comments about their interest, experience, and ability."[8]

---

[6] *Id.*, Ex. A at 10.
[7] *Id.*, Ex. C at 2 (Doc. 131-3).
[8] *Id.*, Ex. A at 10-11.

5

OCR provides an example of such an approach:[9]

| Sport | Interest in Future Participation: At what level do you wish to participate in this sport at [Institution]? | Current Participation: At what level are you participating in this sport? | Prior Experience: At what level did you participate in this sport or any other relevant sport in high school, college, or in another capacity? | |
|---|---|---|---|---|
| Basketball | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ | College<br>☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | High School<br>☐ Varsity<br>☐ Junior Varsity<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ |
| Lacrosse | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ | College<br>☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | High School<br>☐ Varsity<br>☐ Junior Varsity<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ |
| Other sport identified by student[22] | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | ☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ | College<br>☐ Intercollegiate<br>☐ Club<br>☐ Intramural<br>☐ Recreational | High School<br>☐ Varsity<br>☐ Junior Varsity<br>☐ Club<br>☐ Intramural<br>☐ Recreational<br>☐ Other _____ |

The Plaintiffs propose:[10]

2. Which sports are the most popular in your home (sports that you and your family members watch or play)? (Choose only two)

☐ Baseball  ☐ Basketball  ☐ Football  ☐ Golf
☐ Skiing  ☐ Soccer  ☐ Tennis
☐ Other _____

and:[11]

5. Would you play tackle football on an **all girls team** if it were offered by your school.

○ Yes  ○ No  ○  ○  ○

Further, OCR expects schools to gather contact information, "to allow the institution to follow-up with students who wish to be contacted regarding their interests and abilities."[12]

---

[9] *Id.*, Ex. A at 11.
[10] *Id.*, Ex. C at 2.
[11] *Id.*, Ex. C at 4.
[12] *Id.*, Ex. A at 11.

6

B. **Plaintiffs' Proposed Survey Violates Professional Standards**

In addition to ignoring OCR guidance, Plaintiffs' proposed survey employs methodologies designed to prime those taking the survey to respond in a particular way. Research professionals seeking to design an unbiased survey pay careful attention to question wording and ordering.[13] To minimize question order bias, more general questions should be asked before more specific questions.[14] But, "[t]he questionnaire proposed by LifeTrack has placed the key policy question as the final question of the survey, placed after information and a list of questions that increase the saliency of football in the mind of the respondent."[15] As discussed extensively in Joseph Quin Monson's Survey Analysis, by having an introductory purpose that pushes the importance of responding favorably to football and by asking a series of questions that "plants the idea of playing girls football at 'top of the mind' of the student," Plaintiffs' proposed survey aims to get the results they seek.[16] As Mr. Monson states:

> [I]nstead of asking about potential participation in all-girls tackle football to gauge general interest, a set of more specific preliminary questions are used to prompt the respondent to bring to the top of mind a set of considerations before going into the key policy question.  For many respondents this would include considerations that:
>
> 1. Football is popular in my home.
> 2. Football is the sport that gets the most attention at my school.
> 3. I am a football player already because I participated in Powder Puff football.
> 4. Football is fun competition that leads to new friends (or whatever reason was given or imagined for participating in Powder Puff football)

---

[13] Joseph Quin Monson Survey Analysis, attached as Ex. 2 at 7-10.
[14] *Id*.
[15] *Id*. at 8.
[16] *Id*. at 7.

7

> Only after this set of specific questions is the respondent asked if she would participate on an all-girls tackle football team if it were offered. With those considerations at the top of mind, the respondent could be persuaded to say yes in the moment of the survey even if it does not reflect her true preferences before she took the survey. This difference in the true preference and the induced preference from the question ordering fits a textbook definition of measurement error that is best avoided.[17]

Mr. Monson's analysis discusses a number of other methodological and administrative problems with Plaintiffs' proposed survey. But perhaps the proposed survey's flaws can best be seen by comparing it to the example "Sports Interest Survey" that LifeTrack prepared for Washington State schools to use:[18]

 

The Sports Interest Survey that LifeTrack touts on its website as an appropriate Title IX survey stands in contrast to that which the company offers to "evaluate girls' interests" in the context of this lawsuit and which LifeTrack designed "together with counsel."[19]

---

[17] *Id*. at 10.
[18] https://nebula.wsimg.com/ee0ca6743191f54aa237a9d4454e1ad4?AccessKeyId=34D791FF6B59901F9FFA&disposition=0&alloworigin=1. A copy is attached as Exhibit 3.
[19] L. Ledgerwood Decl. ¶¶ 11-12 (Doc. 131-2).

8

### III. PLAINTIFFS' SURVEY IS NOT RELEVANT TO THE EQUAL PROTECTION CLASS CLAIM

Plaintiffs mention in passing that "[t]he survey is designed, in part, to evaluate girls and class members [sic] interests in football to support the equal prot"[20] Plaintiffs do not explain—or cite any supporting authority—how the survey is relevant to the equal protection class claim.

It is well established that Plaintiffs do not have a constitutional right to participate in interscholastic sports. *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994); *Oklahoma High School Association v. Bray,* 321 F.2d 269, 273 (10th Cir.1963); *Burrows by Burrows v. Ohio High Sch. Athletic Ass'n*, 891 F.2d 122, 125 (6th Cir. 1989). "There is no constitutional or statutory right to play any position on any athletic team. Instead, there is only the right to compete for such a position on equal terms and to be free from sex discrimination in state action." *Croteau v. Fair,* 686 F.Supp. 552, 554 (E.D.Va.1988). "Equal Protection merely requires an equal opportunity to compete for such a position." *Mansourian v. Bd. of Regents of Univ. of California at Davis*, 816 F. Supp. 2d 869, 931 (E.D. Cal. 2011). Importantly, courts have found that permitting both sexes to compete on the same team satisfies the equal protection requirements of the Constitution. *See e.g., Hoover v. Meiklejohn*, 430 F. Supp. 164, 172 (D. Colo. 1977).

Additionally, equal protection forbids only intentional discrimination. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). "When a facially neutral rule is challenged on equal protection grounds, the plaintiff must show that the rule was promulgated or reaffirmed *because of,* not merely in spite of, its adverse impact on persons in the plaintiff's

---

[20] Pls.' Mot. at 2.

9

class." *Horner*, 43 F.3d at 276 (citing *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)) (emphasis in original).

The crux of Plaintiff's equal protection claim is that they believe the Constitution requires Districts and the UHSAA to provide and sanction a separate girls-only tackle football program in addition to the current coed football program. Because Defendants' football policy allows either sex to participate (it is "facially neutral"), Plaintiffs have to show that the football policy was promulgated *because of*, not merely in spite of, the effect on class.[21] A survey of interest is simply not relevant to the question of whether the football policy was created because of the effect it has on the Plaintiffs' class.

## CONCLUSION

For the foregoing reasons, Districts respectfully request that the Court deny Plaintiffs' Motion to Conduct Survey of Female Students' Interests in Football.

Dated this 15th day of March, 2019.

OFFICE OF THE UTAH ATTORNEY GENERAL

/s/ Rachel George Terry
RACHEL GEORGE TERRY
MICHAEL J. TETER
Assistant Utah Attorney General
*Attorney for Districts*

---

[21] The class consists of "all present and future Jordan, Canyon, and Granite school district female high school students who seek to participate and/or are or were deterred from participating on girls high school football teams.