# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BRENT GORDON, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JORDAN SCHOOL DISTRICT, *et al.*,<br><br>Defendants. | **FINDINGS OF FACTS<br>AND<br>CONCLUSIONS OF LAW**<br><br><br>Civil No. 2:17-cv-00677-HCN-DAO<br><br><br>Howard C. Nielson, Jr.<br>United States District Judge<br><br><br>FOR PUBLICATION |

Plaintiffs, a group of parents representing their high-school-age daughters, brought this lawsuit against the Utah High School Activities Association and Canyons, Jordan, and Granite School Districts.[1] Plaintiffs challenged Defendants' failure to sanction and offer girls tackle football as a high school sport, asserting a violation of the Equal Protection Clause and various claims under Title IX. Earlier in this litigation, Chief Judge Shelby certified a class comprising "[a]ll present and future Jordan, Canyon, and Granite school district female high school students who seek to participate and/or are or were deterred from participating on girls high school

---

[1] Although, as noted, the Plaintiffs in this case are technically the parents rather than the high school girls themselves, the girls played an impressive and active role in this litigation, including testifying at trial. For convenience, the court will refer to the girls as Plaintiffs throughout the remainder of this opinion.

football teams" for purposes of the Equal Protection Clause claim. Dkt. No. 115 at 16. Chief

Judge Shelby declined to certify a class with respect to Plaintiffs' Title IX claims, however. *See

id.* at 12–13. Following two summary judgment rulings that substantially narrowed the issues

before the court, the only claims that remain pending are Plaintiffs' Equal Protection claim

against all Defendants and their Title IX claims under the effective accommodation and contact

sport rules against Jordan and Granite School Districts. *See* Dkt. Nos. 239, 257-1 at 18–19.

Various motions also remain pending, including *Daubert* motions from both parties, Defendants'

motion to decertify the class, and Defendants' motion to reconsider aspects of Chief Judge

Shelby's summary judgment ruling. *See* Dkt Nos. 271, 274, 256, 357. The court held a thirteen-

day bench trial on Plaintiffs' remaining claims from September 8, 2020 to September 25, 2020,

with closing arguments on October 28, 2020.

Based on its careful review of the evidence and argument presented at trial and in the

parties' pre- and post-trial briefing, the court enters the following findings of fact and

conclusions of law. Based on these findings and conclusions, the court will enter judgment for

Defendants on the remaining claims.

## FINDINGS OF FACT

1.      Defendant Granite School District is a Local Education Agency in Salt Lake

County, Utah, that operates eight high schools that offer athletics programs to their students:

Cottonwood High School, Cyprus High School, Granger High School, Hunter High School,

Kearns High School, Olympus High School, Skyline High School, and Taylorsville High School.

*See* Dkt. No. 76 ("Amended Complaint") ¶¶ 24–26; Dkt. No. 94 ("Granite Answer") ¶¶ 24–26.

2.      Defendant Jordan School District is a Local Education Agency in Salt Lake

County, Utah, that operates six high schools that offer athletics programs to their students:

2

Bingham High School, Copper Hills High School, Herriman High School, Mountain Ridge High School, Riverton High School, and West Jordan High School. *See* Amended Complaint ¶¶ 21–23; Dkt. No. 93 ("Jordan Answer") ¶¶ 21–23.

3.      Defendant Canyons School District is a Local Education Agency in Salt Lake County, Utah, that operates five high schools that offer athletics programs to their students: Alta High School, Brighton High School, Corner Canyon High School, Hillcrest High School, and Jordan High School. *See* Amended Complaint ¶¶ 27–29; Dkt. No. 95 ("Canyons Answer") ¶¶ 27–29.

4.      Defendants Martin Bates, Anthony Godfrey, and Rick Robins are the Superintendents of the Granite, Jordan, and Canyons School Districts, respectively. All of these individuals are sued in their official capacities. *See* Amended Complaint ¶ 31; Granite Answer ¶ 31; Amended Complaint ¶ 30; Jordan Answer ¶ 30; Notice of Substitution, Dkt. No. 190; Amended Complaint ¶ 32; Canyons Answer ¶ 32; Notice of Substitution of Rick L. Robins for James Briscoe, Dkt. No. 264.

5.      Defendants Granite School District, Jordan School District, and Canyons School District are state actors subject to the Equal Protection Clause of the Fourteenth Amendment. *See* Amended Complaint ¶ 24, ¶ 21, ¶ 27; Granite Answer ¶ 24; Jordan Answer ¶ 21; Canyons Answer ¶ 27.

6.      Because these three School Districts receive federal funding, their programs and activities are subject to the requirements of Title IX. *See, e.g.*, Amended Complaint ¶ 25, ¶ 22; Granite Answer ¶ 25; Jordan Answer ¶ 22.

**7.**     The court previously dismissed Plaintiffs' Title IX claims against Canyons School District for lack of standing, however, because none of the Plaintiffs currently attends any high school in that District. *See* Dkt. No. 239.

**8.**     Defendant Utah High School Activities Association ("UHSAA") is an association of 155 private, public, and charter schools in Utah that serve high school students. Each of Utah's 41 public school districts has at least one high school that is a member of UHSAA. *See* Tr. 278:1–279:13.

**9.**     UHSAA, with input from its members and the Utah State Board of Education, regulates interscholastic sports and activities among Utah's public, charter, and private high schools. *See* Tr. 278:1–9, 280:6–281:17.

**10.**     UHSAA sanctions sports and organizes state championships for the sports it sanctions. *See* Ex. 12.

**11.**     All of the high schools in the Districts are members of UHSAA and offer UHSAA-sanctioned sports and activities, though not all high schools in the Districts offer all UHSAA-sanctioned sports. In Granite School District, for example, Olympus and Skyline High Schools do not have drill teams, but they are the only high schools in that District that have boys and girls lacrosse teams. *See* Tr. 278:21–279:10, 1703:7–8, 1752:5–16, 2264:13–19.

**12.**     The parties agree that UHSAA is a state actor subject to the Equal Protection Clause of the Fourteenth Amendment. *See* Dkt. No. 292 at 1.

**13.**     Plaintiff S.G. attends Herriman High School in Jordan School District. She will graduate this year. She has participated in high school athletics in Jordan School District and would play girls high school tackle football if it were offered in her school district. *See* Tr. 1429:13–14, 1494:15–1495:15, 1505:25–1506:5, 1507:13–21.

4

14.     S.G. is represented in this litigation by her father, Mr. Brent Gordon, who co-founded the Utah Girls Tackle Football League ("UGTFL"), and who has acknowledged planning, organizing, and financing this lawsuit. *See* Tr. 1272:11–1273:2.

15.     Plaintiff L.D. currently attends a charter school, Summit Academy, and will graduate this year. *See* Tr. 476:10–15. Plaintiffs argue that L.D. would be eligible to play girls high school tackle football if it were offered at Copper Hills High School under UHSAA's rules because she lives within Copper Hills' boundaries in Jordan School District. *See* Tr. 471:6–472:1, 476:3–15, 2313:18–25. Defendants dispute her eligibility to play high school sports in the Districts, however. *See* Tr. 476:14–15; Ex. 12; Dkt. No. 378 ¶ 726.

16.     Plaintiff D.R. attends Kearns High School in Granite School District. She will graduate this year. *See* Tr. 763:10–764:1. She would play girls high school tackle football if it were offered in her school district. *See* Tr. 766:25–767:12.

17.     Plaintiff Baylee Simmons is a graduate of Riverton High School in Jordan School District. Ms. Simmons graduated in June 2018. *See* Tr. 251:23–252:4. She would have played girls high school tackle football had it been offered in her school district. *See* 256:11–257:11.

18.     Plaintiff Madelyn Calchera attended Hillcrest High School and Alta High School in Canyons School District. Ms. M. Calchera has graduated. *See* Tr. 1215:9–15; 1236:11–13. Ms. M. Calchera would have played girls high school tackle football had it been offered in her school district. *See* Tr. 1218:17–24.

19.     Plaintiff Isabela Calchera was a student who attended Hillcrest High School and Alta High School in Canyons School District. Ms. I. Calchera has graduated. *See* Tr. 1158:11–18. Ms. I. Calchera would have played girls high school tackle football had it been offered in her school district. *See* Tr. 1170:6–11.

5

20.     Plaintiff Isabella Nogales attended Hunter High School and Granger High School in Granite School District. Ms. Nogales has graduated. *See* Tr. 1191:16–1192:3. Ms. Nogales would have played girls high school tackle football had it been offered in her school district. *See* Tr. 1201:12–16.

21.     Plaintiffs also introduced extensive testimony from a young woman named L.G. Although neither L.G. nor her parents are parties to this litigation, L.G. played high school football at West Jordan High School in  Jordan School District. *See* Tr. 900:24–902:3.

22.     Robert Cuff is UHSAA's Executive Director. *See* Tr. 2620:20–23.

23.     Mr. Cuff testified that UHSAA's policy regarding which sports it sanctions for high school boys and girls is set out in its handbook (Ex. 12) in a section titled "ADMINISTRATIVE POLICIES & GUIDELINES." *See* Tr. 2621:6–2628:22.

24.     The handbook states that "[t]he interscholastic athletics within the jurisdiction of this Association are (as now constituted): Baseball, Basketball (B & G), Cross Country (B & G), Drill (Girls), Football, Golf (B & G), Lacrosse (B & G), Soccer (B & G), Softball (Girls), Swimming (B & G), Tennis (B & G), Track & Field (B & G), Volleyball (Girls), Wrestling (B & G)." Ex. 12 at 60.

25.     Mr. Cuff testified that for the sports followed by "(B&G)," UHSAA separately sanctions the sport for boys and for girls. For these sports, Mr. Cuff testified, boys are not permitted to play on girls teams and girls are not permitted to play on boys teams. *See* Tr. 407:25–411:16, 2640:2–22.[2]

---

[2] In addition, for the sports followed by "(Girls)," UHSAA sanctions only girls teams and boys are not permitted to play on these teams. *See* Tr. 409:20-411:11.

26. This testimony is consistent with UHSAA's policy regarding equivalent sports. The handbook provides that "[w]here there is an equivalent sport for both genders, girls may not participate on the boys' team nor can boys participate on the girls' team. If the sport is not offered to both genders at the member school, the opposite gender may not play that sport at that school. They may opt to co-op to another member school. Girls and boys may participate on co-educational teams as defined by the Board of Trustees." Ex. 12 at 58.

27. Mr. Cuff testified that where UHSAA sanctions a sport separately for boys and girls, the boys sport and the girls sport are considered "equivalent sports" and boys are not allowed to play on the girls teams and girls are not allowed to play on the boys teams. *See* Tr. 408:11–410:10; Ex. 12 at 58.

28. Thus, girls are not allowed to play on boys lacrosse, boys basketball, boys tennis, boys track and field, boys cross country, boys swimming, boys wrestling, or boys soccer teams, just as boys are not allowed to play on the girls teams in these sports. *See* Tr. 455:12–456:1.

29. Mr. Cuff testified that because football and baseball are not followed by parentheticals, these teams are open to both boys and girls. *See* Tr. 2639:18–2641:13.

30. Every version of the handbook in evidence lists football as being open to boys and girls in this manner. *See* Ex. 11 at 59, Ex. 12 at 60.

31. The Districts do not have written policies explicitly addressing whether girls can play on high school football teams. *See* Tr. 141:17–142:21, 586:24–587:5, 2236:20–23.

32. The Districts have no policies or practices that exclude girls from playing on these teams, however. *See* (Granite) Tr. 2066:11–2067:14, 2067:15–2068, 2083:11–17, 2091:11–13, 2093:20–25, 2105:17–22, 2071:8–20, 2230:16–2231:3, 2184:5–8, 2287:16–23; (Canyons)

7

1804:1–23, 1804:24–1805:5, 2263:19–23, 2268:10–18, 2269:19–2269:18, 2271:25–2272:15,

2497:23–14; (Jordan) 1899:17–25, 1908:5–8, 1948:9–21, 2033:16–21, 2029:5–12, 2593:16–22.

**33.**     The Districts do not bar any students from playing on their high school football

teams as long as they meet eligibility requirements, which include maintaining at least a certain

minimum grade point average and other gender-neutral requirements. *See* Tr. 965:16–19,

1735:15–1736:23, 2593:16–22.

**34.**     Indeed, in the Districts, high school football is a no-cuts program, meaning that all

students—boy or girl—who come to practice can be on the team so long as they meet eligibility

requirements. *See* Tr. 1797:17–18, 2024:20–2025:3, 2064:4–5, 2213:21–25.

**35.**     As a result, football teams in the Districts are often very large and many team

members, boys as well as girls, do not get significant playing time. *See* Tr. 2053:13–24.

**36.**     Mr. Gordon testified that, based on his review of participation surveys (Exs. 13–

23), 91 girls have played high school football in Utah since 1993. *See* Tr. 1274:10–1275:9.

**37.**     Girls have been allowed to play on the football teams in Jordan School District for

at least 20 years. *See* Tr. 153:5–12.

**38.**     In Granite School District, girls have played high school football as early as 1986

at Taylorsville High School and since the early 1990s at Olympus High School. *See* Tr. 1072:14–

24.

**39.**     Girls continue to play high school football in the Defendant School Districts. *See*

Exs. 25, 26, 66, 67, 68, 673.

**40.**     Indeed, some of the Plaintiffs played on their high school football teams: Ms.

Nogales played for two years at Granger, *see* Tr. 1192:11–14, 1194:7–8; and the Calchera sisters,

Ms. M. Calchera and Ms. I. Calchera, played for one year at Hillcrest, *see* Tr. 1158:23–1159:13. Plaintiffs' witness L.G. also played for two years at West Jordan. *See* Tr. 978:19–23.

     **41.**     Mr. Gordon also testified that he is not aware of any girl ruled ineligible because of her sex, *see* Tr. 1442:24–1443:2, and that he has no personal knowledge of any girl ever being told by a school district or by UHSAA that she could not play high school football, only second-hand information that some girls were told "10, 15, 20 years ago" that they could not play. Tr. 1443:3–1444:6.

     **42.**     There is no testimony or evidence in the record in this case that anyone from UHSAA said or did anything to prevent or discourage any girl from playing football.

     **43.**     While some girls appear to have been discouraged from playing high school football by certain school staff members, *see* Tr. 264:11–21, 769:23–770:1, 1193:1–2; 1203:16–1204:1, other girls were encouraged to play by school staff members, *see* Tr. 1507:5–12, 2094:1–23.

     **44.**     In at least one instance, Mr. Gordon himself appears to have discouraged girls from playing high school football. *See* Tr. 769:1–14.

     **45.**     To be sure, although they allow girls to play high school football, Defendants have not enacted certain policies that might encourage or facilitate girls' participation in this sport.

     **46.**     UHSAA's Board of Trustees has never—to the knowledge of Mr. Cuff—designated high school football as "co-ed football" or "co-educational football." *See* Tr. 413:24–414:22, 415:6–11, 425:23–426:2, 454:20–455:4.

     **47.**     The Districts have likewise not designated the sport as "co-ed" or "co-educational." *See* Tr. 141:4–12, 143:4–144:3, 454:6–455:4, 1128:15–20.

9

48.     Defendants have not advertised that girls are allowed to play high school football or actively promoted girls' participation in the sport. *See* Tr. 143:23–144:3, 1080:6–15.

49.     For example, none of the athletics websites of high schools in the Districts list high school football as "co-educational football," "coed football," or any other designation that makes clear that girls are allowed to play. *See* Tr. 141:9–16, 454:15–17.

50.     No Defendant has adopted a policy specifically to accommodate girls who play high school football by requiring separate dressing facilities, providing female-specific equipment, mandating practice and participation equality, altering the rules of the game to accommodate girls, or otherwise addressing the unique needs of girls who play this contact sport with boys.

51.     Mr. Cuff testified, however, that the "General Statement of Policy" (Ex. 12 at 66) contains policies against harassment and abuse, and that it would be a violation of UHSAA policy to permit such misconduct. *See* Tr. 2645:1–25.

52.     Mr. Cuff further testified that these policies apply specifically to football and are found under the heading, "Football Policies and Pairings." *See* Tr. 2646:21–25.

53.     Jordan, Granite, and Canyons School Districts all have antidiscrimination policies, which are available to students and parents, that prohibit behavior such as bullying and sexual harassment. *See* Tr. 626:11–25, 953:22–24, 2498:23–2501:1, 2588:24–2589:7; Exs. 437, 679.

54.     In addition, Defendants have sometimes referred to high school football as "boys football."

10

55.     Before 2019, the introduction UHSAA's handbook's stated that UHSAA "sanctions 10 girls' sports and 10 boys' sports along with music, theater/drama and speech/debate in six different classifications." Ex. 11 at PL001648.

56.     UHSAA amended its 2020-21 handbook to replace this language with the statement that UHSAA "sanctions 14 sports and the activities of music, theatre, and speech/debate in six different classifications." Exhibit 12 at 60; *see* Tr. 2621:2–21.

57.     Mr. Cuff testified that apart from the reference to ten boys sports and ten girls sports in the introductory section, UHSAA's handbook has never referred to football as "boys football" in all of the years he has reviewed the handbook. *See* Tr. 454:25–455:2.

58.     A table included in a declaration submitted by Mr. Cuff in support of Defendants' Memorandum in Opposition to Plaintiffs' Partial Motion for Summary Judgment, also referenced "boys football." *See* Dkt. No. 35-1 at 4; Ex. 85.

59.     Mr. Cuff testified, however, that the purpose of this table was to list when sports were first sanctioned by UHSAA and that its listing of football as a boys sport simply reflected how the sport was designated at the time it was first sanctioned. *See* Tr. 407:20–21. The Exhibit itself states that the table shows when each sport was "added to Utah High School interscholastic competitions since the first sport, boys football, was started in 1898." Ex. 85. The Exhibit contains no statement about who may currently play football. *See id.*

60.     Mr. Cuff also testified that any other references he may have made to "boys football" would have simply reflected the fact that football is "predominantly played by boys." Tr. 431:3–9.

61.     UHSAA has no policy prohibiting high schools from publicly calling their football teams "boys football" teams. *See* Tr. 456:3–456:9.

11

62. Granite, Canyons, and Jordan School Districts all filed answers in this lawsuit admitting that they offer "boys football teams." *See* Dkt. No. 16 ¶¶ 75–77 (Granite); Dkt. No. 17 ¶¶ 75–77 (Jordan); Dkt No. 15 ¶¶ 75–77 (Canyons).

63. Athletics websites associated with various high schools in the Districts, including Olympus, Skyline, Kearns, Cyprus, Cottonwood, Granger, Taylorsville, Bingham, Herriman, Riverton, West Jordan, Alta, and Brighton have, in recent times, listed football as "boys football"; indeed, many of these schools listed it as boys football until the week before trial began. *See* Exs. 49, 145; Tr. 140:1–141:16, 453:9–456:9, 585:21–586:14, 964:22–965:12, 1128:7–1133:13, 1148:18–1150:7.

64. Although most of the high schools in the Districts have changed their athletics websites so they no longer reference "boys football," they have not informed students that the sport formerly listed on the websites as "boys football" is in fact open to both boys and girls. *See* Tr. 966:10–19.

65. Defendants presented evidence that the District and school web pages reflected a third-party vendor's template that gave no option for listing high school football events other than selecting "boys football." *See* Tr. 2307:17–2309:10, 2504:110–20.

66. The Districts were, however, ultimately able to control the content of these athletics websites as evidenced by their removal of the references to "boys football" before trial. *See* Tr. 140:10–141:12, 585:21–586:14, 2504:10–20, 2530:6–2531:23.

67. Many of Defendants' witnesses testified that, in practice, high school football is generally called "football"—not "boys football." *See* Tr. 1949:1–12, 2071:8–20, 2269:19–24.

68. Even Plaintiffs' own witness, Brent Winch, who is a high school football official, conceded that the sport is generally called just "football." *See* Tr. 1115:10–24.

69.     Plaintiff Ms. Nogales likewise testified that the sport is called "high school football," not "boys football," because girls are allowed to play. *See* Tr. 1204:17–23.

70.     Indeed, in his testimony, Mr. Gordon himself referred to the high school sport as "football," not "boys football." *See* Tr. 1445:2–23.

71.     The Plaintiffs who played or considered playing high school football had a wide variety of experiences.

72.     S.G. testified that she is not aware of any district policy or rule that girls are ineligible to play high school football. *See* Tr. 1506:17–20. S.G. was asked by teachers whether she was playing high school football and was never discouraged from playing by anyone from the Districts. *See* Tr. 1506:24–1507:1, 1507:5–12.

73.     S.G. chose not to play high school football because of physical difference in size and strength between her and the boys who play that sport. *See* Tr. 1507:5–9.

74.     The Calchera sisters, Ms. M. Calchera and Ms. I. Calchera, knew they could play high school football because they asked a teacher and coach. *See* Tr. 1171:3–15. Neither of the sisters spoke to anyone from UHSAA. *See* Tr. 1176:18–1177:4, 1235:18–1236:9.

75.     The Calchera sisters were told that because they were girls, they could not participate in parts of the football experience that took place in the boys locker room, including pre-game speeches, half-time talks, and other strategy sessions. *See* Tr. 1163:24–1164:6.

76.     At Hillcrest High School, Ms. M. Calchera used the girls locker room to change. This locker room was farther away from the football field than the boys locker room. It was often locked, which required her to look for a teacher to unlock it so that she could change before and after football practice. *See* Tr. 1221:21–1222:7.

77.     At away games, the Calchera sisters had to use bathrooms or whatever other random places they could find to change. *See* Tr. 1222:8–10.

78.     The Calchera sisters were also prohibited from participating in some blocking drills because the coaches were not comfortable with boys engaging in these drills with girls. *See* Tr. 1160:15–1161:12.

79.     Ms. M. Calchera was sexually assaulted by a football teammate and, as a result of the trauma from that incident, quit the football team and transferred to a different high school. Her sister, Ms. I. Calchera, transferred as well. *See* Tr. 1158:13–22, 1236:11–1237:1.

80.     At her deposition, D.R. testified that she knew girls could play high school football. *See* Tr. 771:24–772:5, 772:13–773:6. When D.R first met Emily Williams, a teacher and athletic director at Kearns High School, Ms. Williams asked if D.R. played any sports. *See* Tr. 2083:15–17, 2094:1–23. When D.R. said she played football, Ms. Williams asked if she had talked to Coach Rickards about playing on Kearns' high school football team but D.R. said she had not. *See* Tr. 2094:1–23.

81.     At her deposition, D.R. also testified that Mr. Gordon told D.R. she should not play high school football. *See* Tr. 769:1–14. The only other person who said she *should* not play was a high school assistant football coach who said she might get injured. D.R. also testified in her deposition that no one told her she *could* not play. *See* Tr. 769:15–770:4, 770:20–771:5, 774:9–17. D.R. did not testify that she had any contact with UHSAA or saw any publication or information from UHSAA.

82.     At trial, however, D.R. testified that she did not know whether she was allowed to play on the high school football team and that when she asked the assistant coach, he told her no, "that I was a girl and it's a boys team." Tr. 765:23–766:1.

83.    D.R. also testified that she did not play sports in high school, including football,
because she was too busy with schoolwork. *See* Tr. 768:4–11.

84.    L.D. wanted to play high school football, and she talked to the high school
coaches about playing, but her parents would not allow her to do so because they believed she
was too small. *See* Tr. 477:2–18, 480:18–23, 501:1–5, 939:14–24. She knew she was eligible to
play. *See* Tr. 496:20–497:1. L.D. did not testify that she had any contact with UHSAA or saw
any publication or information from UHSAA.

85.    Other than an assistant track coach who said girls should not play football, no one
told Ms. Simmons that she could not or should not play. *See* Tr. 264:11–21. Ms. Simmons never
spoke to anyone from UHSAA. *See* Tr. 268:14–16. Ms. Simmons chose not to play high school
football "[b]ecause I'm small. I would have been pummeled." Tr. 253:17–24, 267:2–268:1. Ms.
Simmons also had no time to play sports after her freshman year in high school because she was
working four jobs. *See* Tr. 261:17–24.

86.    Ms. Nogales knew she could play because her dad asked the coach. *See* Tr.
1192:15–17.

87.    A coach at Hunter High School told Ms. Nogales that if she played football, she
could only be a kicker. *See* Tr. 1193:1–2, 1203:16–1204:1. But no one ever told her that she
could not play on the high school team at all. *See* Tr. 1204:14–16. And no coach or administrator
ever discouraged her from playing football. *See* Tr. 1207:3–5. Ms. Nogales never spoke to
anyone from UHSAA. *See* Tr. 1211:17–25.

88.    Ms. Nogales transferred high schools after being told she could only play as a
kicker on the football team. *See* Tr. 1191:19–1193:18.

15

89.     Ms. Nogales had a "good experience" and a "very positive experience" playing on the Granger High School football team for two years. Tr. 1194:4–8, 1204:24–1205:1. She felt a sense of pride playing with the boys and learned a lot. *See* Tr. 1206:22–1207:2.

90.     While her experience was generally positive, Ms. Nogales also reported that she was called "water girl" by teammates. *See* Tr. 1165:1–7.

91.     Plaintiffs' witness L.G. testified that she had a very positive experience playing high school football her freshman year. *See* Tr. 1045:3–10.

92.     She had a very good relationship with her coach that year, Coach Erickson, who encouraged her to start a girls football club and volunteered to be the advisor. *See* Tr. 1047:17–1048:9. Coach Erickson attended and supported her in her UGTFL games. *See* Tr. 1048:23–1049:5. In fact, L.G. felt that she was Coach Erickson's favorite. *See* Tr. 1049:20–22.

93.     L.G. was named a sophomore team captain at West Jordan High School and was one of only 10 sophomores invited to dress for varsity games. *See* Tr. 983:21–985:15, 985:18, 1045:23–1046:3.

94.     She played at meaningful times in sophomore games. *See* Tr. 997:12–14. She also played on special teams at meaningful times in varsity games. *See* Tr. 1046:17–25. L.G. knew that girls were also playing on the Hillcrest, Cyprus, Kearns, and Roy high school football teams during the time she played for West Jordan. *See* Tr. 987:15–25.

95.     L.G. never spoke to anyone from UHSAA. *See* Tr. 1039:23–25.

96.     L.G. testified that the vice principal called the football team the "boys football team" during announcements, and that the football coaches and players often used gendered language, such as "brotherhood," to describe the team and its values. This made her feel excluded. *See* Tr. 1000:20–1004:10.

16

97.     One time, L.G. changed the word "brotherhood" to "family" when she saw it written on a whiteboard after a practice because she thought "family" was a more inclusive word for the team's values. *See* Tr. 1001:14–1002:17. The next day she discovered that someone had changed the word back to "brotherhood," which made L.G. feel that the gendered language was deliberate. *See* Tr. 1005:2–11.

98.     L.G. was often unable to use the girls locker room to change because she was not allowed to use it when girls teams had games for other sports. *See* Tr. 998:14–999:7.

99.     L.G. was told that, especially at away games, she had to stay with the boys including being in the boys locker room while boys were changing clothes. *See* Tr. 1014:12–17.

100.    L.G. testified that because she had to be in the boys locker room, she was sometimes exposed to partially nude boys, including seeing their naked backsides. *See* Tr. 999:19–23.

101.    L.G. testified that she would simply stare at a wall or find a remote corner in the locker room to avoid additional exposure, but this made her feel uncomfortable. *See* Tr. 999:19–1000:2.

102.    L.G. testified that when she complained about her experience in the boys locker room, her coach told her that "it was the boys locker room, and they can do whatever they want." Tr. 1000:3–5.

103.    L.G. testified that her coach called her "princess" even though he knew she did not like it because she felt it was degrading and highlighted that she was the only girl on the team; her coach told her to "get used to it." Tr. 986:15–987:9

104.    Teammates sent inappropriate text messages in a team group chat that L.G. was included in. *See* Tr. 992:13–19, 993:4–8, 995:2–4.

17

**105.**   L.G.'s teammates also made inappropriate posts on social media. *See* Tr. 1003:8–24.

**106.**   L.G. spoke about her negative experiences on the football team at a Jordan School District School Board Meeting, but no one from the District ever followed up with her about these experiences. *See* Tr. 1018:14–1019:23.

**107.**   L.G. was sexually assaulted by another member of the football team while lifting weights. When she reported the assault to her coach, he told her that she needed to calm down and stop crying. *See* Tr. 1025:1–1031:9.

**108.**   After she was assaulted, L.G. was required to lift weights only in a certain area of the weight room so coaches could keep an eye on her. *See* Tr. 1031:1–13. L.G. was also required to sit near the managers and coaches at the front of the bus rather than with her teammates toward the back. *See* Tr. 2258:7–14.

**109.**   L.G. transferred to a different school as a result of her experiences on the football team. *See* Tr. 1038:18–1039:10.

**110.**   After she transferred, L.G. discovered that her football picture, which had been displayed in the trophy case, had been ripped up. L.G. testified that she believes her male teammates had ripped up the photo. *See* Tr. 1015:2–25.

**111.**   There was no testimony from Ms. Simmons, Ms. I. Calchera, Ms. M. Calchera, Ms. Nogales, or L.D. that any of them ever saw a district, school, or third-party web page that referred to high school football as "boys football."

**112.**   While girls are indisputably allowed to play high school football, and although some girls—including a few of the Plaintiffs—have chosen to do so, it is undisputed that the

number of girls who in fact play is very small compared to the number of boys who do so. The evidence at trial suggested various reasons this might be so.

113.    As illustrated by the testimony of S.G., L.D., and Ms. Simmons, some girls may choose not to play high school football—or may not be allowed to play by their parents—because they, or their parents, are concerned about the differences between their own physical size and strength and the size and strength of the boys who play football.

114.    Indeed, Mr. Gordon testified that the "primary reason" girls do not play high school football is because of their size and the risk of injury. Tr. 1434:13–25.

115.    Mr. Gordon further testified that, "I have discouraged, and I would advise girls, if they were to ask me, not to play on their high school football team. . . . being involved in football, coaching in both the boys' league as well as the girls' league, and I've had experiences where I've seen the abilities of girls to compete and what their level of competition would be like, their size, their weight, speed, agility, those types of things . . ." Tr. 1340:8–15.

116.    Mr. Gordon also testified that other parents told him they did not want their daughters to play high school football because of the risk of injury. *See* Tr. 1435:1–4.

117.    Other girls may not know they are allowed to play.

118.    Some girls have called UHSAA's offices to ask whether they are allowed to play, *see* Tr. 2650:6–13, though there is no evidence that any Plaintiff did so.

119.    D.R. testified at trial that she did not know whether she was allowed to play until she asked an assistant coach. The Calchera sisters likewise asked a teacher and a coach if they could play high school football. And Ms. Nogales's father asked a coach whether she was allowed to play.

**120.**     Individual teachers and coaches may lack necessary training and give inaccurate or improper responses to girls who ask whether they are allowed to play.

**121.**     For example, the Calchera sisters were told by their principal that whether they could play high school football was the football coach's decision. *See* Tr. 1218:14–1219:13.

**122.**     Ms. Nogales was told by a coach that if she played high school football, she could only be a kicker. *See* Tr. 1192:18–1193:8.

**123.**     And D.R. and Ms. Simmons were told by assistant coaches (one of whom was an assistant track coach) that they should not play because they were girls. Indeed, D.R. may have been told that she was not allowed to play though, as noted, her testimony was inconsistent on this point.

**124.**     Still other girls may have had, or fear that they will have, bad experiences, ranging from verbal disparagement, as experienced by Ms. Nogales, to sexual assault, as experienced by L.G. and Ms. M. Calchera.

**125.**     Finally, some girls may be more interested in other sports or have other interests or obligations that prevent them from being able to play football.

**126.**     High school students often must choose among the "many activities" in which they could participate. Tr. 1943:16–1944:3.

**127.**     For example, girls participate in other sports that may conflict with football. *See* Tr. 259:24–260:11 (basketball, cross country, and track); 1006:14–1007:9 (volleyball and softball).

**128.**     And as illustrated by Ms. Simmons, some girls may need to work or may have obligations at home.

**129.**     High school administrators, including Mr. Vande Veegaete and Dr. Dowdle, testified that they do not believe girls tackle football is ready to be implemented as a high school sport. *See* Tr. 1691:16–22, 1741:17–20, 2517:5–22.

**130.**     Defendants offered various evidence in support of this belief.

**131.**     First, whatever their reasons, few girls have actually chosen to play high school tackle football, even though they have been allowed to play on high school teams for many years. *See* Exs. 24, 25, 673.

**132.**     Granite School District has not received any requests from parents, students, community councils, or through the Granite School Board for girls tackle football. *See* Tr. 1730:14–1730:2; 1679:9–11. Mr. Larson of Granite School District testified that, other than Mr. Gordon, no one has asked Granite School District to implement girls high school tackle football during the course of this litigation. *See* Tr. 622:11–623:14.

**133.**     Mr. Vande Veegaete likewise testified that there has been little student, parent, or community support expressed to the Granite School District for girls high school tackle football. *See* Tr. 1695:16–23.

**134.**     In response a focus group survey conducted by the Salt Lake County Health Department to gauge student interest in different activities, Granite School District invested in a variety of activities. It purchased ping-pong tables and portable basketball courts for the schools so students would have free access to those activities. It also started "Just Dance" competitions and made e-sports available. It also found interest in disc golf and badminton. There was only one response to the survey from a girl interested in football, however. *See* Tr. 1683:12–1684:9, 1685:11–1686:25.

21

**135.** Dr. Dowdle testified that there has been little student, parent, or community support expressed to the Canyons School District for girls high school tackle football. *See* Tr. 2495:7–22.

**136.** There are no high school or college girls tackle football leagues anywhere in the Country. Indeed, no college or high school in the country has a girls tackle football team. Other than UGTFL, there are no youth recreational leagues that offer girls tackle football anywhere in the country. *See* Tr. 1460:12–1461:9.

**137.** Developmental teams help child athletes develop the skills and foundations for participating in a high school sport. *See* Tr. 1742:10–13. There are developmental teams for every UHSAA-sanctioned sport. *See* Tr. 1742:14–1744:7. Apart from UGTFL's teams for elementary and junior high school students, there are no such teams for girls tackle football, however.

**138.** No colleges offer girls tackle football scholarships. *See* Tr. 1742:4–6.

**139.** The National Federal of State High School Associations' ("NFHS") rulebook has no rules for football that are specific to girls tackle football. *See* Ex. 30.

**140.** UGTFL, co-founded by Mr. Gordon in 2015, is the first and only youth girls-only tackle football program in the country. *See* Tr. 955:11–24, 1460:12–21.

**141.** UGTFL's president acknowledged that support for the League is limited to Salt Lake County and northern Utah County. *See* Tr. 955:11–24. Mr. Gordon likewise testified that there are no teams outside of Salt Lake and Utah Counties. *See* Tr. 1461:10–12.

**142.** Defendants contrasted the current status of girls tackle football with other sports that have been added for girls in recent years.

143.     In response to the growth of girls wrestling in Utah and the nation, Jordan and

Granite School Districts are offering girls wrestling at their high schools. *See* Tr. 2599:17–21,

1674:2–11. The Districts also pointed to the availability of college scholarships for female

wrestlers as a reason for offering girls wrestling. *See* Ex. 463, NCSA List of Colleges with

Women's Wrestling Programs.

144.     Dr. Godfrey testified that although there are not a lot of students currently

participating in girls wrestling in Jordan School District, the District is offering girls wrestling

because "[w]e offer all of the UHSAA-sanctioned sports. It creates additional opportunities for

girls and there are a lot of national opportunities. It's a growing sport nationally. There are

scholarship opportunities for girls in wrestling. And so we're offering that because that's been

sanctioned." Tr. 2600:1–5.

145.     Parents had expressed interest in and support in girls wrestling by talking to the

Granite School Board and with Mr. Vande Veegaete. *See* Tr. 1077:5–12. Over the past ten years,

Granite has seen "more and more numbers" of girls interested in wrestling, including girls

wrestling "in the all-star matches at the high school level," the "rise in college programs adding

[girls] wrestling[,]" and "a rise in scholarships available in [girls] wrestling." Tr. 1721:11–24;

Ex. 463.

146.     Granite School District recently recruited and hired one of the first female

wrestling coaches in the nation. *See* Tr. 1718:16–1721:10; Ex. 472.

147.     Parents and students in Granite School District also expressed interest in girls

lacrosse. *See* Tr. 624:8–16.

148.     When lacrosse was sanctioned as a high school sport, there was a well-developed

club program already in place that made it much easier to implement. *See* Tr. 2585:6–16. And

23

because there were established developmental youth leagues, many students already had experience with lacrosse by the time they reached high school. *See* Tr. 2585:17–22.

149.    Mr. Cuff testified that at the point at which the Board of Trustees sanctioned lacrosse, it did not resemble girls tackle football in any way. He testified that lacrosse began with 42 girls teams and 42 boys teams. *See* Tr. 2639:9–11.

150.    Granite, Canyons, and Jordan School Districts all sponsor competitive cheer teams, even though competitive cheer is not a UHSAA-sanctioned sport. *See* Tr. 1711:23–1716:2, 1733:14–23, 2174:10–16, 2493:7–9, 2594:1–2599:11.

151.    Competitive cheer has grown significantly in the past 10–15 years. *See* Tr. 2510:15–2511:2, 2594:9–12.

152.    There are post high school scholarship opportunities for students who participate in competitive cheer. *See* Tr. 2512:10–13.

153.    There are regional, state, and national competitions for competitive cheer. *See* Tr. 1713:21–1714:2, 2595:24–2596:9.

154.    While golf used to be a co-ed sport, girls golf is now offered.

155.    When co-ed golf was divided into boys and girls golf, girls throughout the State participated in coed golf. The Utah Junior Golf Association had a large competitive structure with many female participants. The Utah section of the PGA had started a new program for junior golfers, and the numbers were increasing. And colleges were reaching out to golf organizations encouraging increased participation by girls in high school golf because colleges and universities had many unused scholarships for female golfers. *See* Tr. 1870:22–1872:3.

156.    Defendants testified that, in light of their concerns that girls tackle football is not yet ready to be implemented as a high school sport, they are reluctant to invest the significant resources necessary to add this new sport.

157.    Adding new sports is challenging. It increases costs for coaches and equipment, increases wear on fields and facilities, and further complicates scheduling for fields and facilities that are already heavily used, increasing demands on administrators who must supervise activities. *See* Tr. 2492:1–2493:2.

158.    The Districts struggle to manage all of the sports and activities currently offered at the schools. The high schools often have to use junior high fields to accommodate all of the practices. *See* Tr. 2182:20–2183:5.

159.    To add a new sport, the Districts would need to find qualified coaches, which is difficult to do. *See* Tr. 2182:20–2183:5, 2491:17–25. And the coaches would need to be trained. *See* Tr. 1780:2–7, 2012:23–2013:11, 2205:7–22, 2354:18–2355:4.

160.    Despite a well-established club infrastructure with teams associated with many of the Districts' schools, it still took about a year to implement lacrosse. The Districts had to buy equipment, hire coaches, and find storage space for the equipment. *See* Tr. 2584:21–2585:5.

161.    Defendants also testified that not as many girls participate in the sports that they already offer as they would like. *See* Tr. 1667:23–1668:1, 1668:10–1671:24. They further testified that they would prefer to focus their limited resources on increasing girls' participation in existing sports and, if they add new sports, focusing on sports for which girls have expressed greater interest than they have for girls tackle football. *See* Tr. 1733:24–1735:1, 861:3–19.

162.    Plaintiffs, by contrast, maintain that there are ample indicia that enough girls are interested in girls tackle football to support and justify implementation of this sport.

163.    When UGTFL began in 2015, about 50 girls played. *See* Tr. 1289:19–1290:11. By the sixth year, participation had grown to 490 girls, and likely would have been higher but for the COVID-19 pandemic. *See* Tr. 1292:13–15.

164.    In 2019, UGTFL had ten high school teams with players from the Defendant Districts. *See* Exs. 543–548, 551–554.

165.    Of these ten high school teams, one had 26 players on its roster, no other team had more than 21 players, and the two smallest teams had 14 and 15 players, respectively. *See id.*; *see also* Tr. 1462:15–1472:10.

166.    UGTFL allows students from various schools to participate on any given team. *See* Tr. 2311:5–2314:6. If a current UGTFL player recruits a new player, then the new player can join the recruiting player's team, even if she does not live within that team's boundaries. *See* Tr. 982:3–6.

167.    In 2019, only one UGTFL team was made up of players who all lived within the same high school boundaries. The nine other teams were composite teams comprising players from several different high schools. The nine composite teams listed players on their rosters from three, four, five, six (two), seven, nine (two), and ten different schools. *See* Exs. 543–548, 551–554; *see also* Tr. 1462:15–1472:10.

168.    Granite School District has tracked the growth and popularity of girls tackle football in its boundaries. In 2019, Mr. Vande Veegaete of Granite School District examined UGTFL's rosters and found nine students participating in that league who lived within Granite's boundaries. *See* Tr. 1694:10–1695:2. Twelve girls self-identified as attending a Granite high school in 2019. *See* Exs. 552, 553.

**169.**     In 2020, the largest UGTFL team for high school aged girls associated with the
Jordan School District, the Bingham team, had 23 players. *See* Ex. 93. The Copper Hills team
had 21 players, *see* Ex. 95, the Herriman team had 20 players, *see* Ex. 96, the Herriman 2 team
had 21 players, *see* Ex. 97, the Mountain Ridge team had 19 players, *see* Ex. 99, the Riverton
team had 19 players, *see* Ex. 100, and the West Jordan team had 21 players, *see* Ex. 103.

**170.**     The 2020 rosters do not show which schools the players attend or the players'
addresses, so it is unknown how many students on the teams associated with Jordan schools
actually attend the high school associated with the team. *See* Exs. 94, 95, 96, 97, 99, 100.

**171.**     The evidence at trial suggested several unique factors that have contributed to
UGTFL's impressive growth.

**172.**     S.G. appeared in a Super Bowl commercial in 2013. *See* Tr. 622:21–623:1.

**173.**     In addition, UGTFL players were invited to play a short game during halftime at
the 2020 Pro Bowl. *See* Tr. 956:17–957:1.

**174.**     UGTFL's President testified that events such as S.G.'s appearance in a Super
Bowl commercial and UGTFL's playing during halftime at the Pro Bowl have generated interest
for the league. *See id.*

**175.**     Mr. Gordon testified that his daughter's enthusiasm and efforts at the three high
schools she has attended increased interest in girls tackle football at those schools and that
UGTFL's Pro Bowl appearance and media coverage of his daughter have increased the visibility
of, and interest in, UGTFL. *See* Tr. 1428:4–1431:7.

**176.**     Plaintiffs sued the Districts just two years after UGTFL was formed. *See* Dkt. No.
2. The lawsuit has resulted in substantial media coverage and favorable publicity for UGTFL,
which has raised the profile of girls tackle football in Utah. *See* Tr. 622:18–623:14, 1457:5–22.

**177.** There are significant differences between the intensity and demands of UGTFL and those of high school football.

**178.** UGTFL teams hold only nine pre-season practices over the course of three weeks. *See* Tr. 936:18–23.

**179.** Ms. Nogales began spring conditioning with the Granger High School team in March and also had summer conditioning beginning in June. She also took a conditioning class during the school year. By the end of the summer, the team was practicing every day for three hours, and the practices were more intense than UGTFL practices. Practices once the season began were 3–4 hours every day. *See* Tr. 1207:9–1209:16.

**180.** Ms. M. Calchera testified that conditioning for her high school team was much more strenuous and intense than for her UGTFL team. *See* Tr. 1237:2–15. At the end of the summer, there were two practices every day. *See* Tr. 1238:24–1239:2.

**181.** Given these differences, it is not clear that the girls who participate in UGTFL would necessarily be interested in participating in girls high school tackle football.

**182.** Mr. Gordon admitted significant attrition between those who play little league football and those who play high school football. *See* Tr. 1419:5–1420:1. No doubt that is due in part to differences in intensity between the little league and high school football experience.

**183.** Plaintiffs also pointed to other indicators of substantial interest in girls tackle football.

**184.** Nearly 200 girls from Jordan and Granite School Districts signed statements that they would play girls high school tackle football if it were offered. *See* Tr. 1325:1–1336:4.

**185.** These statements were submitted under the penalty of perjury. *See* Ex. 126; Tr. 1329:9–1330:8.

28

186.    These were form statements prepared by Mr. Gordon, however, who played a significant role in distributing them and obtaining signatures. The statements of interest have not been independently verified. *See* Tr. 1328:16–1331:2.[3]

187.    Plaintiffs also point to participation in Powder Puff as an indicia of interest. At the schools in the Districts, Powder Puff is an annual homecoming activity where girls play flag football. *See* Tr. 189:20–190:4, 1060:15–1061:12, 1151:24–1152:11, 1311:12–1317:13, 1496:5–1498:10, 1747:6–1748:12, 1922:15–1924:9, 1994:16–1996:1.

188.    No girls sport in Jordan School District had as many participants, district wide, as Powder Puff had. *See* Tr. 190:15–198:13; Exs. 122, 128, 673.

189.    No girls sport in Granite School District had as many participants at Cottonwood, Cyprus, Hunter, Olympus, and Taylorsville, the five schools that offered Powder Puff, as Powder Puff had. *See* Exs. 15, 123.

190.    Powder Puff, however, is generally held on only one day during homecoming week. The girls play one or two games of flag football. The girls practice for only a few hours and no conditioning, weight training, or camps are required. *See* Tr. 189:20–190:6, 191:8–17, 968:2–7, 1747:10–1748:25.

191.    Additionally, in the fall of 2019, proponents of girls high school tackle football, including about 100 UGTFL players wearing their football jerseys, attended a meeting of the Jordan School District Board to express interest in girls high school tackle football and to explain

---

[3] Defendants objected to the admission of these statements. The court admitted the statements for the limited purpose of showing that the statements were made—*i.e.*, that girls expressed interest in girls high school tackle football—not to prove the truth of their contents—*i.e.*, that the girls would in fact play if the sport were offered. *See* Tr. 1336:16–1338:13.

the experiences of girls who play on high school football teams. The meeting was standing room only. *See* Tr. 941:22–942:15, 1016:11–1020:10.

**192.** Students and parents who were interested in girls tackle football spoke at the meeting, including L.G., the only girl who was playing high school football on a Jordan School District team at the time. *See* Tr. 1018:9–1019:17; Ex. 673.

**193.** After the meeting, no one from Jordan School District followed up with L.G. or any of the other girls who attended or spoke at the meeting to discuss their interest in having girls tackle football offered as a high school sport. *See* Tr. 1019:18–23, 1146:4–1148:14, 2349:4–24.

**194.** Plaintiffs also rely on a survey of student interest in athletics at Canyons, Granite, and Jordan School Districts that was conducted by Dr. Monson and his business, Y2 Analytics, in September and October of 2019. *See* Exs. 130 (administration instructions), 131 (girls results), 132 (questionnaire), 134 (boys results); Tr. 842:21–843:2.

**195.** Dr. Monson is an expert in survey administration and methodology who was retained by Defendants to design and conduct the survey and to offer expert testimony about the survey at trial. *See* Tr. 781:12–784:8, 786:5–786:19.

**196.** The survey was administered during language arts classes to a representative sample of the female students at each school. *See* Tr. 795:2–796:10, 844:9–24.

**197.** 815 female students, constituting twelve percent of the students who participated in the survey in the three Districts, indicated that girls tackle football was a sport they were interested in playing. *See* Tr. 799:16–21; Ex. 131 at Table 40, column C, Rows 46, 47.

**198.** Three percent of the female students (177 female students total) ranked girls tackle football as the sport they were most interested in playing. *See* Exhibit 131 at Table 42. Four percent of female students (208 female students total) ranked it as the sport they were

second most interested in playing, and another four percent (175 female students total) ranked it as the sport they were third most interested in playing.[4] *See id.* at Table 44; Table 46.

     **199.**    Plaintiffs, using the Y2 Analytics survey data, estimated the total number of female students at each high school in each District who would say they are interested in girls tackle football by multiplying the percentage of the female survey participants at each school who indicated interest in girls tackle football by the total number of girls at each school. The following table reflects their estimate:

| High School | Total female students | Percent of survey respondents interested in girls tackle football | Female students likely interested in girls tackle football |
|---|---|---|---|
| Bingham | 1181 | 15.05% | 178 |
| Copper Hills | 1256 | 13.41% | 168 |
| Herriman | 1080 | 16.67% | 180 |
| Mountain Ridge | 742 | 23.08% | 171 |
| Riverton | 1084 | 13.17% | 143 |
| West Jordan | 811 | 12.39% | 100 |
| Cottonwood | 740 | 10.53% | 78 |
| Cyprus | 1246 | 12.93% | 161 |
| Granger | 1512 | 12.27% | 186 |
| Hunter | 1232 | 15.20% | 187 |
| Kearns | 1079 | 16.02% | 173 |

---

[4] Girls were asked to select sports they were interested in, and then to rank them in order of interest. The discrepancies in the numbers and percentages indicated in the text likely result from some girls expressing interest in fewer than three sports and thus not ranking any sport as the one in which they had the third (or, in some cases, even the second) most interest.

| Olympus | 740 | 14.62% | 108 |
| Skyline | 1043 | 8.07% | 84 |
| Taylorsville | 912 | 5.59% | 51 |
| Alta | 1115 | 6.39% | 71 |
| Brighton | 1031 | 8.25% | 85 |
| Corner Canyon | 1122 | 7.66% | 86 |
| Hillcrest | 1067 | 9.36% | 100 |
| Jordan | 943 | 11.89% | 112 |

200.    Plaintiffs compiled a similar estimate of the number of female students at each school in the Districts who would rank girls tackle football as the sport they are most, second-most, or third-most interested in playing, which is reflected in the following table:

| High School | Ranked #1 | Ranked #2 | Ranked #3 | Ranked #1, 2, or 3 |
|---|---|---|---|---|
| Bingham | 55 | 48 | 50 | 153 |
| Copper Hills | 42 | 45 | 60 | 147 |
| Herriman | 76 | 110 | 18 | 204 |
| Mountain Ridge | 72 | 87 | 58 | 217 |
| Riverton | 60 | 39 | 64 | 163 |
| West Jordan | 13 | 23 | 52 | 88 |
| Cottonwood | 19 | 9 | 26 | 54 |
| Cyprus | 29 | 54 | 50 | 133 |

32

| Granger | 51 | 53 | 53 | 157 |
|---|---|---|---|---|
| Hunter | 34 | 64 | 44 | 142 |
| Kearns | 45 | 53 | 54 | 152 |
| Olympus | 15 | 22 | 32 | 69 |
| Skyline | 24 | 13 | 32 | 69 |
| Taylorsville | 23 | 43 | 39 | 105 |
| Alta | 18 | 19 | 33 | 70 |

**201.**     Compared to other sports, interest in girls tackle football varied by school, but consistently ranked in the mid- to low- teens of the sports in which girls expressed the greatest interest. *See* Tr. 864:20–23; Ex. 131, Demonstrative Ex. 678.

**202.**     The percentage of female students who reported that they were not participating in any school-sponsored sport was 43 percent. *See* Tr. 854:18–20. Of those students, 47 percent reported they were not participating because they had no interest in competitive sports. *See* Tr. 854:20–23. Another 22 percent of these students reported that they were not participating because they had chosen to participate in other school-sponsored activities. *See* Tr. 854:24–855:2.

**203.**     The three sports in which the highest percentage of girls expressed interest in Granite School District were volleyball (28 percent), soccer (27 percent), and archery (23 percent). Girls tackle football ranked 14th among the sports in which the highest percentage of girls expressed interest at 12 percent. *See* Tr. 856:14–22. A higher percentage of girls expressed interest in several other sports that are not currently sanctioned by UHSAA than in girls tackle

33

football. In addition to archery, these included competitive cheer (ranked fifth), bowling (ranked sixth), gymnastics (ranked seventh), and sand volleyball (ranked thirteenth). *See* Tr. 856:23–13; Demonstrative Ex. 677.

204.    In Jordan School District, the three sports in which the highest percentage of girls expressed interest were volleyball, archery, and sand volleyball. *See* Tr. 857:25–858:6; Demonstrative Ex. 677. Girls tackle football ranked 11th, in a three-way tie with gymnastics and bowling, among the sports in which the highest percentage of girls expressed interest. *See* Tr. 858:22–859:2; Demonstrative Ex. 677. A higher percentage of girls expressed interest in archery, sand volleyball, and competitive cheer, none of which are currently sanctioned by UHSAA, than expressed interest in girls tackle football. As noted, the same percentage of girls expressed interest in gymnastics and bowling, neither of which is currently sanctioned by UHSAA, as expressed interest in girls tackle football. *See* Tr. 859:11–20.

205.    Overall, volleyball, soccer, and archery consistently ranked as the top three sports in which girls expressed the greatest interest and enthusiasm. *See* Tr. 861:23–862:15; Ex. 131; Demonstrative Ex. 677.

206.    Interest in girls tackle football at Mountain Ridge High School—where girls tackle football ranked third among the sports in which the highest percentage of girls expressed interest—was an outlier, meaning it was higher than at any other school. Mountain Ridge was the only school where girls tackle football was among the top ten sports in which the highest percentage of girls expressed interest. *See* Tr. 867:18–869:12. The unusually high level of interest in girls tackle football at Mountain Ridge High School may be attributable to the fact that Plaintiff S.G. was a student there at the time of the survey. *See* Tr. 869:13–870:2.

34

207.     Plaintiffs' expert, Dr. Donna Lopiano, testified regarding her analysis of the survey data.

208.     Dr. Lopiano has more than 40 years of experience in women's athletics and frequently advises colleges and high schools on Title IX compliance. *See* Tr. 656:15–657:6.

209.     In connection with this advice, Dr. Lopiano frequently administers student interest surveys. *See* Tr. 658:14–16. These surveys are similar to the Y2 Analytics survey designed by Dr. Monson and administered to the Districts' students.

210.     After she administers a survey, Dr. Lopiano reviews the survey results and, based on her experience, advises schools on what sports they can and should add for girls. *See* Tr. 663:24–665:15, 667:16–668:10.

211.     Dr. Lopiano testified that, in her experience, whenever the number of women or girls who rank a sport as one of the top four sports they would be interested in playing is equal to or greater than the average team size for the sport, schools have always succeeded in forming a girls or women's team in that sport, provided the schools take steps to support and promote the team such as hiring a coach and encouraging girls or women to play. *See* Tr. 667:23–668:10.

212.     It is Dr. Lopiano's opinion, based on the amount of interest expressed in the Y2 Analytics survey data, that all three Districts could successfully form girls tackle football teams at each of their high schools and sustain competition among these teams. *See* Tr. 693:14–21, 699:6–700:9.

213.     Indeed, Dr. Lopiano noted that eleven high schools in the Districts—Bingham, Copper Hills, Herriman, Mountain Ridge, Riverton, Cyprus, Granger, Hunter, Kearns, Taylorsville, and Corner Canyon—had 105 girls or more who would rank football among the top

35

three sports that they are most interested in playing, which is three times as many athletes as are necessary to form a successful football team according to Defendants' own experts.

214.    Dr. Lopiano acknowledged, however, that she is not aware of any studies or reports that substantiate her anecdotal experience regarding a one-to-one or other consistent relationship between the number of girls who express interest in playing a sport on a survey and actual participation. *See* Tr. 732:15–19.

215.    Dr. Monson, by contrast, testified that there is not a one-to-one ratio between expressions of interest on a survey and actual future participation. *See* Tr. 851:13–19.

216.    Rather, Dr. Monson testified, "it's notoriously difficult to rely on a survey-responded self-reported prediction of their future behavior. People are generally not very good at foreseeing in the future what they will do." Tr. 850:1–5. For example, in surveys regarding voter turnout, more people report they will vote than actually vote. *See* Tr. 850:6–16.

217.    Dr. Monson further testified that his survey was not designed to measure likely participation in any given sport or activity. Had that been the objective, the survey would have been designed differently. *See* Tr. 787:4–14, 848:14–849:2.

218.    Dr. Monson testified that it would be difficult to model future participation in girls tackle football based on the survey results because there is little data about current participation and there is a lot of uncertainty about predicting participation for a new sport. *See* Tr. 871:19–872:3.

219.    Dr. Monson further testified that "[t]o really estimate girls tackle football and project an accurate model, I think you'd want a survey that was much more specific in terms of all of the things that factor into a decision to play a particular sport, and that's not what we set out to do in this case." Tr. 872:4–8.

220.    Dr. Monson testified that to produce a reliable model to predict future participation, he would need more information than what was gathered by his survey. The model would require information comparing the sports that were ranked first, second, third, and fourth by students, what seasons those sports were played, and the costs and other requirements for participating in those sports. *See* Tr. 871:2–18.

221.    Dr. Monson testified that the survey did not gather data on students' willingness to commit the necessary time, effort, and money to meet the conditioning, practice, physical, and other requirements for participating in particular sports. *See* Tr. 850:17–851:12; Ex. 132.

222.    Dr. Monson testified that the survey did not attempt to assess students' ability to sustain teams. While it gathered information about the number of students who had participated in high school sports in the past and what sports students are interested in, the survey results do not speak to whether students (1) understand the commitment required to play football; or (2) have the ability to sustain teams. *See* Tr. 879:5–886:13.

223.    Defendants also offered various counterexamples in an attempt to rebut Dr. Lopiano's methodology.

224.    Dr. Monson testified that when he applied Dr. Lopiano's formula for predicting the number of students who would participate in a sport based on the number of students who ranked it first, second, or third among the sports in which they are most interested in playing to predict *boys'* participation in high school football in the Granite School District, the participation numbers predicted by Dr. Lopiano's formula were dramatically higher than actual participation numbers, as illustrated by the following table:

|  | Cottonwood | Cyprus | Granger | Hunter | Kearns | Olympus | Skyline | Taylorsville |
|---|---|---|---|---|---|---|---|---|
| Projected Participation | 108 | 308 | 431 | 424 | 360 | 267 | 163 | 204 |
| Actual Participation | 70 | 97 | 80 | 84 | 90 | 120 | 67 | 75 |

Tr. 874:8–23, 2177:17–2179:22.

225.    Dr. Monson testified that, based on Dr. Lopiano's formula, 1,975 male students should have participated in high school football in Granite School District in 2020, but only 683 actually did so—even though high school football is a no-cuts program in Granite School District and all eligible students willing to come to practices can be on their high school's team. *See* Tr. 2179:23–2180:4.

226.    Defendants argued that Granite School District's experience with lacrosse also casts doubt on Dr. Lopiano's methodology. A large number of girls at Taylorsville High School expressed interest in lacrosse on the survey. But even though the principal invested time and effort into offering lacrosse at that school, girls did not actually come out to play in sufficient numbers to form a team. *See* Tr. 1140:8–17.

227.    Defendants argued that Granite School District's experience with freshman soccer likewise casts doubt on Dr. Lopiano's methodology. Granite's student focus groups expressed high levels of interest in soccer (which is consistent with the survey results). *See* Exs. 131, 331, 333, 339, 382, 387. Based on these expressions of student interest, Granite tried to increase girls' participation in sports by organizing freshman soccer. The District hired coaches, bought uniforms, organized competitions, and advertised the program to students, but not enough students showed up to sustain teams. Granite created the opportunity, but the students did not come. *See* Tr. 1731:5–1732:13.

228. In addition to disputing the extent of interest in girls tackle football, the parties disputed how many girls would be needed to form a team and how many teams would be needed for meaningful competition.

229. UHSAA has no rule regarding roster size, other than the rule in the NFHS football rulebook that each team must start the game with 11 players. *See* Tr. 2449:3–12, 2458:4–2459:14.

230. There are no high school football programs in the Districts' competitive regions that have fewer than 20 players on their roster, however. *See* Tr. 1798:24–1799:2, 2023:3–7, 2290:1–16, 2359:4–7.

231. Some teams have had to cancel games because they do not have enough players, even though they had more than 30 players, because of the specialized nature of certain positions. *See* Tr. 1793:24–1794:10, 2030:19–25, 2063:1–19, 2220:13–19, 2392:12–17.

232. The Wayne High School football team, which had only 18 players, competed only briefly before having to disband partway through its season. *See* Tr. 1377:8–1378:18.

233. It is the opinion of Brenan Jackson, UHSAA's assistant director in charge of football, that 35 players is the minimum necessary to safely and successfully form and maintain a high school football team. *See* Tr. 2433:14–2436:14, 2437:12–17.

234. Mr. Jackson's opinion was based on his extensive experience with high school football generally, as well as his specific experience with varsity high school teams with fewer than 35 players. *See* Tr. 2413:8–11. Mr. Jackson was a football coach at three small high schools: Millford High School, Manti High School, and Kanab High School. *See* Tr. 2415:14–2418:3. He was also an athletic director at Manti High School, the principal at Manti High School, and the principal at Kanab High School. *See* Tr. 2416:15–2420:10. He has served as an assistant

superintendent at the district level with responsibilities over the training of coaches. *See* Tr. 2410:11–20. He also has experience coaching 6th, 7th, and 8th grade football. *See* Tr. 2418:4– 17. He has been in his current position as UHSAA Assistant Director over high school football in Utah for over three years. *See* Tr. 2420:22–2421:12. He is a member of the NFHS Football Rules Committee and regularly attends seminars given by the NFHS. *See* Tr. 2421:24–2423:23.

235.     Mr. Jackson was familiar with the experience of Wayne High School's efforts to create a varsity football team. In conversations with those attempting to organize that team, Mr. Jackson explained that a team of fewer than 35 players would be unsafe. "[Y]ou know, I recommended that, you know, 35 is a really safe number. We talked about all sorts of kinds of the intricacies from a principal standpoint and a former head football coach in building a program, and some of the challenges that I knew that he would face because Wayne County High School as a 1A school plays fall baseball." Tr. 2435:12–19.

236.     Mr. Jackson further testified that with only 18 players on its football team, by the fourth game of the season, injuries prevented Wayne High School from having enough players to finish the game. *See* Tr. 2435:24–2436:11.

237.     In his testimony, Mr. Jackson explained what happened in that game and following: "And one of the–it was kind of sad, because towards the end of the game when Kanab High School was up 50-something to nothing, they had one little player to put back in because everybody else was hurt. And I believe that was the last game that they played because all of their kids were hurt and were not able to continue the season." Tr. 2436:6–11.

238.     Mr. Jackson further testified about the reasons for the injuries:

Q. Do you know why the players were injured? Was there an overriding reason, or is it just the luck of somebody falling into your knee?

40

A. I believe that, in my opinion, there was–a football program is– it's a year-long program, with weightlifting and conditioning. And when you have so few numbers of players, fatigue becomes a serious denominator that you just have to prepare for, and that's why having adequate numbers of players can solidify being able to complete your season.

Tr. 2436:15–24.

**239.** Matt Rickards is the head football coach at Kearns High School in the Granite School District. *See* Tr. 2040:22-25.

**240.** Coach Rickards testified that when kids play both offense and defense, they have more contact during games, which correlates to higher rates of injury. *See* Tr. 2049:9–21. He testified that larger rosters help decrease injuries because students play less and have fewer contacts. *See* Tr. 2048:13–22. Coach Rickards testified that larger rosters also allow students to specialize on offense or defense, which is preferable. *See* Tr. 2047:1–25, 2061:4–24.

**241.** Coach Rickards considers a roster of fewer than 40 to be "very small"; in fact, he has never coached a roster with fewer than 40 total players. *See* Tr. 2060:1–5.

**242.** Coach Rickards testified that coaching a team of less than 35 players would be challenging; there would be more injuries because kids would be playing more, playing "both ways"—*i.e.*, both offense and defense—and playing on special teams. *See* Tr. 2060:15–2061:1.

**243.** Jody Morgan is the head football coach at Riverton High School and the Districts' expert on high school football. Coach Morgan has coached at the high school, college, and NFL level. Coach Morgan is currently the president of the Utah Football Coaches Association. *See* Tr. 2353:18–21, 2354:10–12, 2390:16–20, 2355:5–8.

**244.** Coach Morgan testified that if he had only 20 students on his team, some would be playing both ways and their risk of injury would increase. *See* Tr. 2371:5–24.

41

245.    Coach Morgan believes he needs more than 50 players to operate certain points of practice. *See* Tr. 2369:20–2370:7.

246.    Coach Morgan testified that students sometimes leave the football team because of "family issues or commitments." Tr. 2361:12–14.

247.    Coach Morgan testified that high school football teams need to have depth in positions because if there is an injury or other circumstance, students cannot be easily moved between positions. *See* Tr. 2362:1–25.

248.    Coach Meifu of Mountain Ridge High School also testified that high school football teams need to have depth in positions, and that he often loses players throughout the course of the season for a number of reasons, including injury. *See* Tr. 2021:8–24, 2029:16–2030:9.

249.    Arron Whitehead is the head football coach at Olympus High School in the Granite School District. *See* Tr. 2199:9–15.

250.    Coach Whitehead testified that to run an effective practice he needs 44 athletes. *See* Tr. 2218:1–2219:7.

251.    Coach Kjar of Corner Canyon High School testified that he often has football players leave the team for a number of reasons, ranging from injuries to lack of interest. *See* Tr. 1785:2–14.

252.    In summary, the testimony from the active coaches Defendants presented as witnesses, including Coach Kjar, Coach Rickards, Coach Morgan, Coach Meifu, and Coach Whitehead, was that there are a lot of injuries and attrition in high school football and that high school football teams need 35 players or more. *See* Tr. 1785:2–14, 2029:16–2030:9, 2029:19–22, 2060:1–5, 2060:15–2062:1, 2218:1–2219:7, 2368:24–2369:14, 2369:20–2370:7, 2371:5–24.

42

253. Defendants presented additional testimony regarding team size.

254. Chris Shipman is currently the physical education and athletic specialist for Granite School District. He previously coached football at Granger High School. *See* Tr. 2165:20–2167:15. For two of the years when Mr. Shipman was a football coach at Granger, the football program had approximately 35 players. Because of the small number of players, Granger was only able to have a varsity team and no sub-varsity teams. *See* Tr. 2169:23–2170:8. It was very challenging to run a football program with only 35 participants. *See* Tr. 2170:9–19. Students had to learn multiple positions. *See* Tr. 2170:14–19. And the small number affected safety and injuries because students were having to play more in games and practices, which led to more injuries. *See* Tr. 2171:19–23. And the small numbers made it difficult to finish the season. *See* Tr. 2171:16–18.

255. Mr. Shipman testified that the challenges of running a program with less than 40 student athletes would be the same regardless of whether the team were all girls or whether the teams against which it competed were equally small. *See* Tr. 2171:24–2172:5.

256. Mr. Cluff, UHSAA's director of officiating, testified that during the third week of trial alone, nine sub-varsity football games were canceled because at least one of the two teams did not have enough players to safely field a team, and that none of these cancelations was due to COVID-19. He also testified that this phenomenon is not uncommon mid-way through a season. *See* Tr. 2321:6–2322:8. However, in every case, the varsity team competed its game. Sub-varsity games are often canceled to protect players for the varsity roster. *See* Tr. 2322:9–16.

257. Ms. Olson, athletic director at Hunter High School, testified that every year students leave the football team because it is too time consuming, because it is too physically

43

demanding, because of problems with grades, because of scheduling conflicts with outside employment, or because their parents pull them off the team. *See* Tr. 2290:1–16.

258.    By contrast, it is Mr. Gordon's opinion that viable eleven-player girls high school tackle football teams could be formed and sustained with as few as 20 girls. *See* Tr. 1417:4–22.

259.    Mr. Gordon's opinion is based on his experience coaching little league football and as a UGTFL coach and administrator.

260.    Although Mr. Gordon testified that he played football when he was in ninth grade, he could not recall whether his team was part of a high school football program. He has not otherwise played high school football, however, nor have any of his children. Indeed, with the possible exception of ninth-grade football, Mr. Gordon never played any high school sport. *See* Tr. 1391:21–1392:14.

261.    In addition, Mr. Gordon has never coached high school football, nor any other high school sport. *See* Tr. 1393:20–1394:8. In UGTFL, he has coached eleven-player football for high school aged girls for only three years. *See* Tr. 1394:12–1395:1.

262.    Mr. Gordon is not certified to coach in high school. *See* Tr. 1395:2–1397:17.

263.    Mr. Dixon, UGTFL's President, testified that USA Football is an authoritative source of information, rules, and safety guidelines for youth and high school football, including rules on preventing and treating concussions. *See* Tr. 933:22–23, 947:14–948:1, 953:17–954:14.

264.    Those authoritative guidelines state:

An athlete playing on offense, defense, and special teams will have greater cumulative head impact exposure and will be at higher risk for injury than an athlete playing a single position.

The fewer the number of players on a team, the greater the chance some players will need to participate in repeated drills raising head impact exposure and potentially injury risk.

44

> The task force also recognizes multiple contributing factors that affect head impact exposure and the parallel effects on an individual football player's brain. For example: Position played (Linemen receive more total blows than other positions. . . . Two-way players versus those who only play offense or defense.

Tr. 1399:14–1400:3, 1401:19–24.

265.     Mr. Gordon, however, offered his opinion as an expert that "safety doesn't have to do with the number of players that you have" and that "there's no correlation between the two." Tr. 1401:25–1402:25. He later reiterated the same view:

> Q. Okay. So notwithstanding that the USA Football publication stated, "The fewer the numbers of players on a team, the greater the chance some players will need to participate in repeated drills, raising head impact exposure and potential injury risk," it's your expert opinion that the team size does not correlate with safety; is that correct?
>
> A. That's correct.

Tr. 1403:15–21.

266.     Mr. Gordon admits there would be attrition on high school teams from lack of playing time, injuries, illness, and grade ineligibility. *See* Tr. 1420:2–1421:7.

267.     Plaintiff girls testified that girls are injured and that girls quit during UGTFL's season. *See* Tr. 505:1–5, 1210:8–24.

268.     Ms. Simmons could not continue to play girls tackle football after sustaining an injury. *See* Tr. 271:11–20.

269.     D.R. likewise quit playing girls tackle football after sustaining injuries. *See* Tr. 776:2–18.

270.     In addition, L.D. testified that it is better to have substitutes for the games. *See* Tr. 500:1–13.

271.     The parties also dispute how many teams are necessary for meaningful competition.

272.    There are no high school sports in Utah that operate within a single school district. *See* Tr. 2515:13–18.

273.    Diving was canceled as a sanctioned high school sport when the number of teams dropped below twenty. *See* Tr. 2322:17–2323:10.

274.    Mr. Sorensen of Jordan School District testified that competition solely among schools within a single school district's boundary would not resemble competition for other sports or activities and would be inadequate for a state championship. *See* Tr. 177:8–17.

275.    Coach Morgan testified that four teams are not enough for competitive play among high school teams. *See* Tr. 2377:5–21.

276.    Ms. Whittaker of UHSAA testified that ten percent of UHSAA member schools (about 15 schools) is a minimum for viable competition. *See* Tr. 1873:4–18.

277.    Mr. Jackson testified regarding the number of teams required for safe and meaningful competition. He testified that although eight would be enough for a state tournament bracket, eleven or twelve teams would be required for regular season play. *See* Tr. 2437:22–2439:11.

278.    Mr. Gordon, by contrast, offered his opinion that the minimum number of teams necessary for competition would be four. *See* Tr. 1382:19–1383:7, 1413:25–1414:7.

## CONCLUSIONS OF LAW

The court will address in turn Plaintiffs' equal protection claim, their remaining Title IX claims, and the various pending motions. For the reasons explained below, the court will enter judgment for Defendants on all remaining claims.

46

## I.

It is well settled that laws that discriminate on the basis of sex are subject to heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment. *See United States v. Virginia*, 518 U.S. 515 (1996). The mere fact that Defendants do not provide separate football teams for boys and girls is not discrimination on the basis of sex, however. To be sure, Plaintiffs have identified some cases holding that the Equal Protection Clause *permits* separate teams for boys and girls. *See, e.g.*, *O'Connor v. Board of Education*, 449 U.S. 1301, 1307 (1980) (opinion of Stevens, J., as Circuit Justice); *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association*, 647 F.2d 651, 658 (6th Cir. 1981); *Cape v. Tennessee Secondary School Athletic Association*, 563 F.2d 793, 795 (3rd Cir. 1977); *Fortin v. Darlington Little League, Inc.*, 514 F.2d 344, 350 (1st Cir. 1975). But Plaintiffs have not cited, and the court is not aware of, any authority holding or even suggesting that the Equal Protection Clause *requires* separate teams. Rather, it appears that the Equal Protection Clause is satisfied so long as both girls and boys are allowed to play on the same team. In *Hoover v. Meikjohn*, for example, the court found an equal protection violation when girls were completely denied the opportunity to play a sport that boys were allowed to play. The court held that this violation could be rectified by allowing both sexes to play on the same team. *See* 430 F. Supp. 164, 172 (D. Colo. 1977).[5]

In this case, as a matter of both policy and practice, girls are allowed to play high school football in Utah, including in the Defendant Districts. As for policy, there is no question that

---

[5] The *Hoover* court made clear that this violation could also be remedied by adding a girls team or by eliminating the boys team, and that the Equal Protection Clause permitted the Defendant to choose among these three remedies. *See Hoover*, 430 F. Supp. at 172.

every version of UHSAA's handbook in evidence designates football as being open to both boys

and girls, as Mr. Cuff testified. *See* Findings of Fact ¶¶ 27–30. The handbook lists the following

UHSAA-sanctioned sports: "Baseball, Basketball (B & G), Cross Country (B & G), Drill (Girls),

Football, Golf (B & G), Lacrosse (B & G), Soccer (B & G), Softball (Girls), Swimming (B & G),

Tennis (B & G), Track & Field (B & G), Volleyball (Girls), Wrestling (B & G)." Findings of

Fact ¶ 24. Although Plaintiffs argue otherwise, the court concludes that in context the

significance of the lack of a parenthetical next to "football" is clear. It means that unlike those

sports followed by "(B & G)"—basketball, cross country, golf, lacrosse, soccer, swimming,

tennis, track & field, and wrestling—UHSAA does not sanction separate boys and girls teams. It

also means that like baseball, but unlike those sports followed by "(Girls)"—drill, softball, and

volleyball—both boys and girls are permitted to play this sport on the same team. This is not an

arbitrary administrative interpretation that can be changed at the whim of UHSAA's Executive

Director, as Plaintiffs claim. Rather it reflects the obvious and most natural reading of the

handbook's language.

In arguing to the contrary, Plaintiffs rely on the following statement from UHSAA's

handbook:

> Where there is an equivalent sport for both genders, girls may not participate on
> the boys' team nor can boys participate on the girls' team. If the sport is not
> offered to both genders at the member school, the opposite gender may not play
> that sport at that school. They may opt to co-op to another member school. Girls
> and boys may participate on co-educational teams as defined by the Board of
> Trustees.

Dkt. No. 384 ¶ 253 (quoting Ex. 12 at 58) (emphasis omitted). Plaintiffs argue that this language

means that girls and boys can play on the same team only if it has been explicitly designated as

co-educational. The court disagrees. Girls are prohibited only from playing on "boys' teams" and

they are so prohibited only "where there is an equivalent sport for both genders." Thus, for example, girls may not play on boys soccer teams because UHSAA sanctions both boys and girls soccer. But this rule does not apply to football: because UHSAA does not separately sanction boys and girls football, there is not "an equivalent sport for both genders," and high school football teams—which are open to both genders—are not "boys' team[s]" in all events.

The most natural reading of the handbook's language is consistent with Defendants' practice. As a factual matter, there is no question that both boys and girls are allowed to play high school football in Utah, including in the Defendant Districts. While the evidence at trial did not definitively establish when girls were first allowed to play high school football, it is clear that girls have played since at least 1994 and perhaps as early as 1986. *See* Findings of Fact ¶ 38. Indeed, some of the Plaintiffs in this case have themselves played on their high school football teams. *See* Findings of Fact ¶ 40. And Mr. Gordon conceded that he is not aware of any girl ruled ineligible to play football because of her gender, that he has no personal knowledge of any girl ever being told by a school district or UHSAA that she could not play football, and that he had only second-hand information that some girls may have been told that they could not play "10, 15, 20 years ago." Findings of Fact ¶ 41. Plaintiffs submitted no evidence that anyone from UHSAA said or did anything to prevent or discourage any girl from playing, and while there is some evidence that some of the Plaintiffs may have been discouraged from playing by school personnel, there is no evidence that these isolated incidents reflected the policies or practice of either UHSAA or the Districts and ample evidence that these isolated incidents were contrary to Defendants' policies and practices. *See* Findings of Fact ¶ 43, ¶¶ 51–57.

To be sure, there is also no question that UHSAA's handbook previously referenced "10 boys sports and 10 girls sports," including football in its tally of "boys sports," and that

Defendants have at times referred to high school football as "boys football," including on school websites. *See* Findings of Fact ¶55, ¶¶ 61–66. While some of these references to "boys football" may be attributable to third party website vendors, or may simply describe high school football's historical origin, not all of these references can be so explained. None of the Plaintiffs testified, however, that they were even aware of UHSAA's references to "boys football" or had ever seen a reference to "boys football" on any school website—let alone that these references made them believe that girls were not allowed to play. *See* Findings of Fact ¶ 111. Furthermore, both the handbook and Defendants' testimony make clear that these references are inaccurate and that the official name of the sport is "high school football" or simply "football." Findings of Fact ¶¶ 56–57, ¶¶ 67–70. Indeed, Plaintiffs' own witnesses testified that the sport is usually called "football." Findings of Fact ¶¶ 68–70.

Nor do Defendants' occasional inaccurate references to "boys football" change the fact that, both as a matter of policy and practice, girls are allowed to play. The court has found no authority supporting the proposition that where, as here, a sport is officially called by a non-gendered name and girls are unquestionably allowed to play the sport both as a matter of policy and practice, occasional gendered references to the sport violate the Equal Protection Clause.

In arguing to the contrary, Plaintiffs overread the court's holding in *Haffer v. Temple University of the Commonwealth System of Higher Education, et al.*, 678 F. Supp 517 (E.D.P.A. 1987). In that case, Temple University had elsewhere "strenuously argued that all [of its] teams were open to women," but for purposes of its motion for summary judgment, it conceded "the fact that Temple sponsors separate teams for men and women" and did not dispute Plaintiffs' submission "that, in fact, all of Temple's intercollegiate athletic teams are and have been either exclusively male or exclusively female." *Id.* at 524 (internal quotations omitted). The court thus

50

assumed for purposes of deciding the motion for summary judgment "that Temple's intercollegiate athletic program explicitly classifies on the basis of gender" while making clear that its ruling did not preclude Temple "from attempting to prove at trial that all teams are open to women." *Id*. at 524 & n.4. *Haffer* thus has no application here. While high school football is occasionally but mistakenly referred to as "boys football," there is no question that girls are allowed to play. *Haffer* neither holds nor suggests that in such circumstances occasional inaccurate gendered references to a sport establish a sex-based classification that gives rise to heightened scrutiny.

In short, the court concludes that Defendants do not classify students on the basis of sex in determining who may play high school football. To the contrary, it is undisputed that girls are permitted to play football and do in fact play, albeit in extremely limited numbers.

The Equal Protection Clause, of course, protects not only against explicit gender classifications but against more subtle forms of disparate treatment as well. As the Tenth Circuit has explained,

> Intentional discrimination can take several forms. When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of legislative purpose is required. By contrast, when the law under review is generally applicable to all persons, no presumption of intentional discrimination arises; proof is required. This is so because many laws, perhaps most and often unavoidably, affect some groups and persons differently than others even though they involve no *intentional* discrimination. . . . [But] bitter experience teaches that even rules of general application *can* harbor lurking discriminatory purposes. . . . So while laws of general applicability may not be subject to a presumption of intentional discrimination, neither are they shielded from scrutiny.

*SECSYS, LLC v. Vigil*, 666 F.3d 678, 685–86 (10th Cir. 2012) (internal citations omitted).

Because Defendants' policies and practices are neutral on their face—including their policy of allowing both boys and girls to play football on the same teams rather than forming

separate boys and girls teams—Plaintiffs bear the burden of proving that invidious discriminatory purpose was a motivating factor for these policies and practices. *See Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 266–268 (1997). The Supreme Court has made clear that to establish such invidious discriminatory purpose, Plaintiffs must demonstrate "more than intent as volition or intent as awareness of consequences." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). Rather, they must show "that the decisionmaker[s]…selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*.

The court concludes that Plaintiffs have failed to make this showing. Plaintiffs point to the vast disparity in numbers between the boys and girls who play high school football; Defendants' failure to actively advertise that girls can play football, to recruit girls to play football, and to adopt policies specifically accommodating girl players; and the harassment and poor treatment that some of the Plaintiffs and witnesses experienced when they played high school football or tried to do so. But for the following reasons, the court concludes that none of these factors—whether considered individually or in combination with one another and Defendants' occasional references to "boys football"—suffices to establish invidious discriminatory purpose or otherwise violates the Equal Protection Clause.

Plaintiffs are correct that, both by numbers and percentages, very few girls play high school football and that the overwhelming majority of players are boys.[6] But while "a starkly

---

[6] According to the Sports Participation Survey, in 2019, the most recent year for which statistics were available at trial, 8596 boys and 19 girls played high school football in Utah. Girls thus comprised only .22% of high school football players in the State. And while participation

disparate impact…may well inform a court's investigation into the law's underlying intent or purpose," *SECSYS*, 666 F.3d at 686, the law is clear that disparate impact itself does not violate the Equal Protection Clause. *See Washington v. Davis*, 426 U.S. 229, 240 (1976). And while in rare cases the Supreme Court has found a discriminatory purpose based solely on disparate impact, *see Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the Supreme Court has made clear that unless a "clear pattern, unexplainable on grounds other than [intentional discrimination], emerges . . . a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative, and the Court must look to other evidence." *Arlington Heights*, 429 U.S. at 266.

In this case, the very small proportion of girls who play football is not "unexplainable on grounds other than" intentional sex discrimination. *Id.* To the contrary, the evidence in this case suggests several other plausible reasons for girls' low rate of participation. It is undisputed, for example, that some girls do not play because of fear of injury or other concerns related to physical differences in size, speed, and strength between themselves and the boys who play high school football. *See* Findings of Fact ¶¶ 113–116. Other reasons suggested by the evidence range from cultural attitudes regarding football to practical ones—students have finite time to allocate among academic, social, extracurricular, and family activities and obligations, and different students choose to set different priorities among competing interests and commitments. *See*

---

statistics are not available before 1972, from that date until 2019, only 91 girls are recorded as having played high school football in Utah. During the same period, 333,552 boys have played. It thus appears that only .027% of the students who played high school football in this State between 1972 and 2019 were girls. *See* Dkt. No. 384 at 48–49. It is of course possible that those reporting the statistics overlooked some female players, though it is doubtful that any such oversights would meaningfully change this percentage. And of course the extremely low percentage of female players between 1972 and 2019 reflects in part the fact that no girls are officially reported to have played before 1993. *See* Findings of Fact ¶ 36.

Findings of Fact ¶¶ 125–128. This is simply not a case like *Yick Wo* or *Gomillion* where disparate impact alone suffices to establish discriminatory purpose.

Plaintiffs are also correct that Defendants have not officially labeled high school football "co-ed football" or publicly advertised it as a co-ed sport, have not actively recruited girls to play football, and have not formally enacted rules or policies specifically aimed at accommodating girls' participation in football. *See* Findings of Fact ¶¶ 45–50. Though there is evidence in the record that some individual coaches and schools have made efforts to accommodate girls who played football, the court has no doubt that there is substantial room for improvement by Defendants in this respect. *See* Findings of Fact ¶¶ 72, 80. But although active promotion and affirmative accommodation of girls' participation in football of the sort lacking here may be highly desirable as a matter of policy, the court is not convinced that it is required by the Constitution.

While Plaintiffs argue that the Equal Protection Clause requires Defendants to "remove the vestiges of wholesale exclusion of girls from high school sports," Dkt. No. 384 at 75, the only authority offered in support of this proposition are cases addressing the duty to actively integrate schools to overcome the effects of lengthy and entrenched racial segregation. *See United States v. Fordice*, 505 U.S. 717, 728 (1992); *Green v. County School Board*, 391 U.S. 431, 438 (1961). Although the court takes Plaintiffs' allegations of discrimination very seriously, it believes the holdings of cases such as *Fordice* and *Green* reflect the unique constitutional context in which they arose and are not readily extended outside that context. *Cf. Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1340 n.8 (11th Cir. 2000) (declining to extend *Fordice* beyond the specific context in which it was decided); *Burton v. City of Belle*

*Glade*, 178 F.3d 1175, 1190 (11th Cir. 1999) (noting the "unique nature" of school desegregation).

Plaintiffs are also correct that the evidence at trial established that some girls who have played high school football have had negative experiences. *See* Findings of Fact ¶ 124. This does not appear to be uniformly true, however. Ms. Nogales, for example, had good experiences and felt that she was a respected and valued member of her football team. *See* Findings of Fact ¶ 89. And even Plaintiffs' witness L.G., whose experiences were among the most negative discussed at trial, had some good experiences as well. She testified that she had a positive experience playing football her freshman year, had a good relationship with her coach, received meaningful playing time on the sophomore and varsity teams, and was named captain of her sophomore team. *See* Findings of Fact ¶¶ 91–94.

A number of girls, however, have had very troubling and discriminatory experiences. Some girls were told by classmates and even staff members that they should not play football because of their sex. *See* Findings of Fact ¶¶ 82, 85, 87, 90, 123. At least one Plaintiff was told that if she joined the team, she would only be allowed to play kicker, a position in which she was not interested. *See* Findings of Fact ¶ 122. At least two girls were often allowed to practice only with each other and were not included as full members of the team as a result. *See* Findings of Fact ¶ 78. Plaintiffs also presented evidence of two girls who were sexually assaulted by their teammates. *See* Findings of Fact ¶¶ 79, 107. One of Plaintiffs' witnesses also testified that she received inappropriate messages as a member of a team group chat and that her teammates and coaches repeatedly used the word "brotherhood" to promote team spirit and unity, which caused her to feel excluded. *See* Findings of Fact ¶¶ 96–97, 104–05. The same witness was exposed to partially nude boys as a result of having to spend time in the boys locker room and was called

"princess" by her coach even after she made clear that she felt this nickname was demeaning. *See* Findings of Fact ¶¶ 100–03. She was also isolated from her teammates on the bus and in the weight room after reporting the sexual assault. *See* Findings of Fact ¶ 108. Finally, following the season, she discovered her football photo had been ripped up and believed her male teammates were responsible. *See* Findings of Fact ¶ 110.

Plaintiffs, however, have failed to establish that these incidents resulted from any practice or policy of UHSAA or any of the Districts. To the contrary, these incidents appear to directly violate Defendants' explicit policies. Mr. Cuff offered testimony regarding UHSAA's policies against harassment and abuse, which apply specifically to football. *See* Findings of Fact ¶¶ 51–52. The Districts also have antidiscrimination policies that apply to their students. *See* Findings of Fact ¶ 53.

Consistent with Tenth Circuit authority, the court concludes that Defendants should be treated comparably to municipal defendants for purposes of Section 1983 liability. *See Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1124–25 (10th Cir. 2008); *Murrell v. School District No. 1, Denver, Colorado*, 186 F.3d 1238, 1249–50 (10th Cir. 1999). Defendants have argued that they should be so treated, and Plaintiffs have not disagreed. *See* Dkt. No. 383 at 14.

Under the rules governing municipal liability, it is well settled that single or isolated decisions or acts by an employee will not subject the government entity to liability unless (1) the employee acts pursuant to an official policy or longstanding custom or practice or (2) it is the government entity's policy-making body that acted or made the decision such that the action or decision "may fairly be said to represent official policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Ross v. U.S.*, 910 F.2d 1422, 1430 (7th Cir. 1990). To hold a municipality

56

liable a plaintiff must show that "through its deliberate conduct, the municipality was the moving force behind the conduct alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipality and the deprivation of federal rights." *Bryan County v. Brown*, 520 U.S. 397, 404–05 (1997) (cleaned up). Plaintiffs have failed to make such a showing.

It is thus clear that none of the factors urged by Plaintiffs establishes an equal protection violation. But even considering all of these factors together—the occasional inaccurate references to "boys football," the stark disparity in the numbers of girls versus boys that play football, Defendants' failure to formally label football as "coed football" or otherwise to promote or accommodate girls participation on high school football teams, and the unauthorized (and indeed prohibited) harassment and mistreatment suffered by some girls who played football—the court concludes that Plaintiffs have failed to prove that discrimination against girls was a motivating factor for Defendants' policies and practices; that is, Plaintiffs have failed to demonstrate not just "intent as volition or intent as awareness of consequences," but rather that Defendants "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects" on girls who want to play football. *Feeney*, 442 U.S. at 279.

The court will thus enter judgment for Defendants on Plaintiffs' equal protection claim.

## II.

The court next turns to Plaintiffs' remaining claims under Title IX. This statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. A regulation implementing

Title IX provides that "[a] recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). Under this regulation, whether a recipient provides equal athletic opportunity to both sexes turns, "among other factors," on "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." *Id*. While the regulation lists other factors, the Tenth Circuit has held that "an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of students of both sexes." *Roberts v. Colorado State Board of Agriculture*, 998 F.2d 824, 828 (10th Cir. 1993).

Applying policy guidance issued by the Department of Health, Education and Welfare in 1979, the Tenth Circuit has held that

> "substantial proportionality" between athletic participation and [student] enrollment provides a safe harbor for recipients under Title IX. In the absence of such gender balance, the institution must show that it has expanded and is continuing to expand opportunities for athletic participation by the underrepresented gender, or else it must fully and effectively accommodate the interests and abilities among members of the underrepresented gender.

*Id.* at 829 (*citing* Title IX Intercollegiate Athletics Policy Interpretation 44 Fed. Reg. 71,413, 71,418 (1979) (the "1979 Policy Interpretation")) (cleaned up). Here, Chief Judge Shelby granted summary judgment for Plaintiffs on whether there is substantial proportionality between athletic participation and student enrollment at the schools in the Defendant Districts. *See* Dkt. No. 44. He also granted summary judgment for Plaintiffs on whether the Districts have expanded and continued to expand opportunities for athletic participation by the underrepresented gender. *See id*. As a result, liability under Title IX in this case turns on whether the Districts fully and effectively accommodate the athletic interests and abilities of their female students.

58

According to further policy guidance issued by the Department of Education in 1996, whether the Districts fully and effectively accommodate the athletic interests and abilities of their female students turns on whether there is "(a) unmet interest in a particular sport; (b) sufficient ability to sustain a team in the sport; and (c) a reasonable expectation of competition for the team." Dkt. No. 160-50 at 10 ("1996 Clarification"). While both the 1979 and the 1996 administrative guidance specifically address intercollegiate sports, the 1996 guidance indicated that the "general principles" set forth in both guidance documents "often will apply to elementary and secondary interscholastic athletic programs." *Id.* at 11, n.1.

The Tenth Circuit's decision in *Roberts* makes clear that Plaintiffs bear the burden of establishing that Defendants fail to fully and effectively accommodate the athletic interests and abilities of their female students—that is, Plaintiffs bear the burden of proving that there is unmet interest in a particular sport, sufficient ability to sustain teams in the sport, and a reasonable expectation of competition for those teams. *See Roberts*, 998 F.2d at 829 n.5 (10th Cir. 1993).[7] This burden is consistent with the text and structure of Title IX, which generally requires that plaintiffs prove discrimination. *See, e.g.*, *Davis v. Monroe County Board of Education*, 526 U.S. 629, 630–31 (1999); *Doe v. University of Denver*, 952 F.3d 1182, 1190 (10th Cir. 2020);

---

[7] Although Plaintiffs argue that subsequent policy guidance shifts the burden to Defendants on these issues, the guidance they invoke does not explicitly purport to do so. *See* 1996 Clarification; 2010 OCR Letter. Even if it did, Plaintiffs have provided no authority for the proposition that the court could disregard the Tenth Circuit's binding decision in *Roberts* based not on an intervening regulation promulgated after notice and comment, *see National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), but rather solely on informal administrative policy guidance.

*Seamons v. Snow*, 84 F.2d 1226, 1232 (10th Cir. 1996). As explained below, the court concludes

that Plaintiffs have failed to carry this burden.[8]

## A.

The court first addresses the "unmet interest" prong. The Department of Education's

Policy guidance suggests that to determine "whether an institution has unmet interest . . . in a

---

[8] Plaintiffs also challenge Defendants' compliance with the "Contact Sports Rule." This rule provides that

> a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

34 CFR § 106.41. Under this rule,

> if an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex under the following circumstances: (1) The opportunities for members of the excluded sex have historically been limited; and (2) There is sufficient interest and ability among members of the excluded sex to sustain a viable team and a reasonable expectation of . . . competition for that team.

44 Fed. Reg. 71,413, 71,418 § VII(C)(4)(a).

The court is not convinced this rule applies here. Although football is specifically (and unsurprisingly) defined as a contact sport, the Districts do not "sponso[r] a team for members of one sex" in football. To the contrary, as noted above, the Districts' football teams are open to girls as well as boys, as a matter of both policy and practice. Even if the contact rule applies, moreover, the Districts' compliance with this rule turns on whether "[t]here is sufficient interest and ability among members of the excluded sex to sustain a viable team and a reasonable expectation of . . . competition for that team"—essentially the same factors on which their compliance with the more general requirement that they effectively accommodate the interests and abilities of members of both sexes turns in this case. (There is no dispute that athletic opportunities for girls have been historically limited, the other factor on which compliance turns.) Accordingly, even if this rule applies, it adds nothing to the broader question of Title IX compliance in this case.

particular sport," the court should "evaluat[e] a broad range of indicators." 2010 OCR Letter at 4.
These include:

- whether an institution uses nondiscriminatory methods of assessment when determining the athletic interests and abilities of its students;

- whether a viable team for the underrepresented sex was recently eliminated;

- multiple indicators of interest;

- multiple indicators of ability; and

- frequency of conducting assessments.

*Id*. Survey results alone are not dispositive. *See* Ex. 12, n.14.

In this case, Plaintiffs introduced substantial evidence of girls' interest in girls high school tackle football. Plaintiffs pointed to the results of the student interest survey, which showed that significant numbers of girls expressed interest in playing girls tackle football and ranked that sport highly among the sports they were most interested in playing. *See* Findings of Fact ¶¶ 197–200. Plaintiffs also introduced evidence of the large number of girls who participate in Powder Puff in the Districts, as well as the significant and increasing number of high school-aged girls who play on UGTFL teams. *See* Findings of Fact ¶¶ 163, 187–89. Plaintiffs also noted the high attendance, including by parents and an estimated 100 high school girls interested in girls tackle football, at the Jordan School District Board meeting during which L.G. discussed her experience playing football, *see* Findings of Fact ¶¶ 191–92, as well as 200 statements gathered by Mr. Gordon and signed under penalty of perjury by girls expressing interest in girls high school tackle football, *see* Findings of Fact ¶¶ 184–85.

To be sure, this evidence is not unequivocal. As noted, survey results alone are not dispositive. And while the survey did show meaningful interest in girls tackle football, that sport

was significantly less popular among girls than other sports that are not currently offered, including archery, gymnastics, bowling, and sand volleyball. *See* Findings of Fact ¶¶ 203–05. It is also obvious that playing girls tackle football on a high school team would require significantly greater commitment than participating in Powder Puff or even playing in UGTFL. *See* Findings of Fact ¶¶ 177–81, 190. And while UGTFL's growth has been impressive by any measure, it is not clear how many of the girls who play in the league actually live within the Districts. *See* Findings of Fact ¶¶ 166–70. The 200 statements of interest are form statements, drafted by Mr. Gordon, that have not been verified. *See* Findings of Fact ¶ 186. And while many girls did attend the Jordan School District Board meeting, it is not clear how many of these girls are eligible to play sports within the Defendant Districts.

In addition, at least some evidence suggests that interest in girls tackle football is less than Plaintiffs suggest. Among other things, the Districts presented evidence that they have received few direct expressions of interest in girls tackle football and that girls have not played high school football in significant numbers even though they have been permitted to do so since at least 1994. *See* Findings of Fact ¶¶ 131–35. In this respect football differs significantly from other sports, such as wrestling and golf, which were once offered as coed sports but are now offered separately to boys and girls. *See* Findings of Fact ¶¶ 143–46, 154–55.

After considering all of the evidence and argument, the court has no doubt that there is meaningful interest in girls tackle football in the Districts. The low rate of girls' participation in high school football does give the court some pause in attempting to assess the extent of this interest, however. Other factors give the court pause as well. There is not a single college or high school in the United States that has a girls tackle football team. There does not appear to be another youth league in the United States other than UGTFL. There are no other development

leagues, and no colleges offer scholarships for girls tackle football players. In short, the level of popularity of girls tackle football shown by Plaintiffs appears to be a unique phenomenon within Salt Lake and Utah Counties. Even the popularity of girls tackle football in this area appears to be closely associated with one particularly impressive family, the Gordons. S.G. is a talented young athlete whose success has been nationally recognized and has no doubt affected her peers' interest in girls tackle football. S.G.'s father, Mr. Gordon, has been the driving force behind UGTFL's success and appears deeply committed to the growth of the sport. This litigation—planned, promoted, and funded by Mr. Gordon—has also no doubt focused attention on the sport in this area.

The court does not intend these observations to detract from the Gordons' commitment or from UGTFL's impressive growth and success. But given that the popularity of girls tackle football in the Districts, as of now, seems closely associated with a single Plaintiff and her family, and given the lack of similar popularity anywhere else in the State—much less the nation—the court has some hesitance in evaluating the extent of lasting interest in girls tackle football. For purposes of the first prong, the issue is only whether there is unmet interest, however—not whether that interest is sufficient to sustain a team or to create a reasonable likelihood of competition. And the court concludes that Plaintiffs have demonstrated at least some degree of unmet interest in girls tackle football.

## B.

The court turns next to whether there is "sufficient ability to sustain a team in the sport." According to policy guidance issued by the Department of Education, factors used to evaluate whether there is sufficient ability among students of the underrepresented sex to sustain a team in a sport include: (1) "the athletic experience and accomplishments" of students "interested in

63

playing the sport"; (2) "opinions of coaches, administrators, and athletes" about whether students

have the ability to sustain a team, and; (3) "participation in other sports…that may demonstrate

skills or abilities that are fundamental to the sport being considered." 2010 OCR Letter at 6–7.

Further,

> [n]either a poor competitive record nor the inability of interested students or
> admitted students to play at the same level of competition engaged in by the
> institution's other athletes is conclusive evidence of lack of ability. It is sufficient
> that interested students and admitted students have the potential to sustain an
> intercollegiate team.

1996 Clarification at 11.

In setting forth their respective positions regarding whether there is sufficient ability to

sustain a team, the parties dispute how many players are needed to sustain a high school football

team. The court agrees that this is an important consideration and first addresses this issue.

There are certain indicators on which the court will be unable to rely. First, there are no

girls high school tackle football teams anywhere in the country from which the court could draw

conclusions about how many girls are necessary to sustain a team. Second, owing at least in part

to no-cuts policies, the high school football teams in the Districts are massive—probably even

excessive—in size and thus do not necessarily demonstrate how many players are needed to

sustain a team.

The court does, however, give great weight to the consistent testimony of high school

coaches and administrators regarding the number of players necessary to sustain a team. The

broad consensus reflected by these witnesses' testimony is that thirty-five players would be

sufficient, although probably fewer than ideal, for a team to compete and run effective practices,

as well as to mitigate, at least somewhat, against the risk of attrition due to injury and other

factors. *See* Findings of Fact ¶¶ 233–54.

To be sure, Mr. Gordon offered his expert opinion that twenty players would suffice to sustain a girls football team. *See* Findings of Fact ¶¶ 258–59. Even assuming that Mr. Gordon is qualified to offer an expert opinion despite never having coached—and possibly never even played—high school football,[9] the court significantly discounts his opinion given this lack of experience. The court recognizes that Mr. Gordon does have experience coaching in UGTFL and the Timpanogos Youth League. Based on the evidence it heard at trial, however, the court concludes that high school football is significantly more intense, both in the number of games and the amount of required practice, than the sport as played in either UGTFL or a youth league. *See* Findings of Fact ¶¶ 177–81. The court also notes that Mr. Gordon's opinion appears to reflect his view that injury rates are not dependent on team size. *See* Findings of Fact ¶ 265. This view conflicts with the great weight of evidence at trial, including USA Football's safety guidelines, which even Plaintiffs' witness Mr. Dixon acknowledged as authoritative. *See* Findings of Fact ¶¶ 263–64. Mr. Gordon's idiosyncratic view on this issue provides further reason to discount his proffered expert opinion regarding team size.

Having carefully considered all of the evidence, the court thus concludes that at least 35 players are needed to sustain a high school football team.

As discussed, the results from Dr. Monson's survey suggested that the following numbers of girls have at least some interest in girls tackle football at the various high schools in the Districts:

---

[9] Both Defendants and Plaintiffs filed *Daubert* motions to exclude some or all of the opposing parties' proffered expert testimony on this issue. The court addresses these motions in Part III.

| High School | Total female students | Percent of survey respondents interested in girls tackle football | Female students likely interested in girls tackle football |
|---|---|---|---|
| Bingham | 1181 | 15.05% | 178 |
| Copper Hills | 1256 | 13.41% | 168 |
| Herriman | 1080 | 16.67% | 180 |
| Mountain Ridge | 742 | 23.08% | 171 |
| Riverton | 1084 | 13.17% | 143 |
| West Jordan | 811 | 12.39% | 100 |
| Cottonwood | 740 | 10.53% | 78 |
| Cyprus | 1246 | 12.93% | 161 |
| Granger | 1512 | 12.27% | 186 |
| Hunter | 1232 | 15.20% | 187 |
| Kearns | 1079 | 16.02% | 173 |
| Olympus | 740 | 14.62% | 108 |
| Skyline | 1043 | 8.07% | 84 |
| Taylorsville | 912 | 5.59% | 51 |
| Alta | 1115 | 6.39% | 71 |
| Brighton | 1031 | 8.25% | 85 |
| Corner Canyon | 1122 | 7.66% | 86 |
| Hillcrest | 1067 | 9.36% | 100 |
| Jordan | 943 | 11.89% | 112 |

In addition, the survey results suggested that the following numbers of girls ranked girls tackle football as one of the three sports in which they are most interested:

| High School | Ranked #1 | Ranked #2 | Ranked #3 | Ranked #1, 2, or 3 |
|---|---|---|---|---|
| Bingham | 55 | 48 | 50 | 153 |
| Copper Hills | 42 | 45 | 60 | 147 |
| Herriman | 76 | 110 | 18 | 204 |
| Mountain Ridge | 72 | 87 | 58 | 217 |
| Riverton | 60 | 39 | 64 | 163 |
| West Jordan | 13 | 23 | 52 | 88 |
| Cottonwood | 19 | 9 | 26 | 54 |
| Cyprus | 29 | 54 | 50 | 133 |
| Granger | 51 | 53 | 53 | 157 |
| Hunter | 34 | 64 | 44 | 142 |
| Kearns | 45 | 53 | 54 | 152 |
| Olympus | 15 | 22 | 32 | 69 |
| Skyline | 24 | 13 | 32 | 69 |
| Taylorsville | 23 | 43 | 39 | 105 |
| Alta | 18 | 19 | 33 | 70 |

Based on the survey results, it is Dr. Lopiano's opinion that there is sufficient interest to form girls tackle football teams at each of the high schools in the Districts. Dr. Monson, who designed the survey, disagrees that this conclusion can be drawn from the data, however. As he

67

explained, the survey was not designed to measure likely participation in any given sport or activity and, had that been the objective, the survey would have been designed differently. *See* Findings of Fact ¶ 217. Dr. Monson also testified that "[i]t's notoriously difficult to rely on a survey-responded self-reported prediction of their future behavior. People are generally not very good at foreseeing in the future what they will do." Findings of Fact ¶ 216. Dr. Lopiano herself acknowledged that her methodology for predicting whether teams could be formed is not supported by any studies. *See* Findings of Fact ¶ 214. And it appears that her methodology— which suggests that "if you build it, they will come"[10]—contradicts at least some of the Districts' experience. For example, despite significant expressions of interest and effort by school officials, Taylorsville High School was unable to form lacrosse teams and girls freshman soccer did not succeed in the Granite School District. *See* Findings of Fact ¶¶ 226–27.

Dr. Lopiano's apparent methodology would also appear to overstate dramatically the number of boys who actually play high school football, which is only a fraction of the number of boys who Dr. Monson's survey suggests would rank football as one of the three sports in which they are most interested—even though the Districts' no-cuts policies for football allow all students who are eligible and come to practices to be on their high school teams:

|  | Cottonwood | Cyprus | Granger | Hunter | Kearns | Olympus | Skyline | Taylorsville |
|---|---|---|---|---|---|---|---|---|
| Projected Participation | 108 | 308 | 431 | 424 | 360 | 267 | 163 | 204 |
| Actual Participation | 70 | 97 | 80 | 84 | 90 | 120 | 67 | 75 |

Findings of Fact ¶ 224.

---

[10] An experience perhaps unique to Ray Kinsella in the movie *Field of Dreams*, Phil Alden Robinson, Universal Pictures (1989).

Even assuming that the survey results and other evidence of interest establishes that the Districts could *form* teams at many if not all of their schools, moreover, Plaintiffs' must demonstrate sufficient interest and ability to *sustain* teams. Although the administrative guidance does not directly address this issue, the court believes that the word "sustain" has a temporal connotation and suggests that Plaintiffs must show not only that the Districts could form teams now, but also that they would be able to maintain teams over time. The American Heritage Dictionary's first definition of "sustain" is "[t]o keep in existence; maintain, continue, or prolong." *The American Heritage Dictionary of the English Language* (5th ed. 2011); *see also The American Heritage Dictionary of the English Language* (3rd ed. 1992) (defining "sustain" as "[t]o keep in existence; maintain"). Webster's Third likewise defines "sustain" as "to cause to continue (as in existence or a certain state or in force or intensity): to keep up, esp. without interruption, diminution, or flagging: maintain, prolong." *Webster's Third New International Dictionary* (1961).[11]

Although the evidence at trial certainly demonstrated that girls tackle football is currently having a moment in two specific counties in Utah, it is difficult to predict whether current levels of interest will continue. UGTFL is only a few years old and it is the only league of its kind in the country. At least for now, it has teams only in Salt Lake County and northern Utah County. In addition, its popularity—as well as the popularity of girls tackle football more generally in the

---

[11] To be sure, in *Roberts* the Tenth Circuit stated that the defendant was "incorrect in its assumption that CSU must sustain a softball team indefinitely. To the contrary, once all the plaintiffs in this case have transferred or graduated, defendant could return to court and seek to have the injunction dissolved." 998 F.2d at 834. But this was because after the plaintiffs had transferred or graduated, it was likely that no one would have standing to support the continued injunction. The court did not suggest that "sustain" does not have a temporal meaning—indeed, if anything, the court's discussion suggests the contrary. After all the court did not say that defendants were incorrect because "sustain" simply means "form."

Districts—seems closely associated with the Gordons, and has been fueled by high-profile appearances, media coverage, advertisements, and the publicity surrounding this lawsuit. In addition, despite UGTFL's success and present levels of interest in girls tackle football, there is currently no infrastructure that could help the Districts sustain healthy girls tackle football teams over time. There are no high school girls tackle football teams anywhere in the country, let alone in Utah. There are no girls tackle football associations. There are no youth development teams anywhere, apart from UGTFL, that could feed experienced players into the high schools. And there are no college teams or scholarships opportunities that high school players could look forward to.

There is no doubt that this is a close question, given the survey data, UGTFL's success, and the current popularity of girls tackle football in the Districts, but the court believes that Plaintiffs likely have not met their burden of establishing that the Districts could sustain girls high school tackle football teams. The court does not rest its ruling on this ground, however, because, as will be explained next, it concludes that even if there is sufficient ability to sustain teams, Plaintiffs have failed to demonstrate a reasonable likelihood of competition.[12]

## C.

Finally, the court concludes that Plaintiffs have failed to establish a "reasonable likelihood of competition." As the Tenth Circuit has explained, even if there are students whose

---

[12] Plaintiffs also argue that Defendants could reduce the number of players required to sustain teams by adopting six or eight player football for girls. These options are recognized by National Federation of High School Rules and have been adopted in various States. Utah, however, has not adopted these types of football. Because the court ultimately concludes that Plaintiffs have failed to establish a reasonable expectation of competition, the court need not decide whether Title IX requires the Districts to adopt for girls a format for football that it has not adopted for boys.

interests and abilities are not being accommodated, "the institution may still decline to upgrade or create an intercollegiate team if there is no reasonable expectation of competition for that team within the institution's normal competitive region." *Roberts*, 998 F.2d at 831.

According to the Department of Education's policy guidance, the factors used to evaluate whether there is a reasonable expectation of competition are "competitive opportunities offered by other schools against which the institution competes; and competitive opportunities offered by other schools in the institution's geographic area, including those offered by schools against which the institution does not now compete." 2010 OCR Letter at 13.

In this case, there are no existing competitive opportunities—whether offered by other schools against which the schools in the Districts currently compete or by schools in the Districts' geographic area against which the schools in the District do no not now compete. There are certainly no high school leagues, in Utah or anywhere else in the country. Indeed, there are no high school teams, in Utah or anywhere else in the country. And there is no infrastructure that would suggest that teams are forthcoming—there no development leagues (apart from UGTFL's offerings for younger girls), no college teams, and no scholarship opportunities. Indeed, there is only one youth recreational league—UGTFL—and no one has suggested that its club teams would provide reasonable competition for any high school teams the Districts may be able to form. The lack of potential competition is even starker in this case than in *Mansourian v. Board of Regents of University of California*, where the court held that Title IX did not require a university to add a separate women's wrestling team despite evidence of interest among its own students, because at that time there was only one other varsity and one club team in the state, and no more than six official intercollegiate women's wrestling teams in the entire country. 816

F.Supp.2d 869, 927–28 (E.D. Cal. 2011). Simply put, there is *no possibility* of competition at this time—let alone *a reasonable likelihood* of competition.

To be sure, administrative guidance provides that the institutions "may be required by the Title IX regulation to actively encourage the development of competition when overall athletic opportunities within the region have been historically limited for the members of one sex." 1979 Policy Interpretation, 44 Fed. Reg. 71,413, 71,418; 1996 Clarification at 11. And Plaintiffs cite authority, consistent with this guidance, holding that "[t]he absence of a conference or league for a sport, however, is insufficient to show that a reasonable expectation of competition does not exist." *Portz v. St. Cloud State University*, 401 F.Supp.3d 834, 859 (D. Minn. 2019).

The policy guidance, however, says only that institutions "may" be required to encourage the development of competition—not that they always must do so, regardless of circumstances. Indeed, even the authority on which Plaintiff relies makes clear that "institutions need not engage in fruitless exercises to drum up support for adding a new team within a region or conference." *Portz*, 401 F.Supp.3d at 862 (D. Minn. 2019). And given the complete lack of girls high school tackle football teams anywhere in the country—let alone in the Districts' geographic area—the court readily concludes that any efforts to drum up competition voluntarily would be "fruitless." Indeed, the court concludes that the only prospect for competition under these circumstances is if the Districts create it from scratch. And because the Districts have made clear that they are unwilling to invest the time and resources needed to do so absent clearer evidence of sustained student interest than they have currently seen, the only prospect for competition is if the court mandates it by judicial fiat.

For a variety of reasons, the court believes this would be inappropriate. First, the court does not believe that Title IX, its implementing regulations, or the policy guidance contemplates

such a result. Although the policy guidance indicates that institutions "may," in some circumstances, be required "to actively encourage the development of competition," it does not say that they have a duty to create it out of whole cloth. In addition, competition that will come into existence only if mandated by judicial decree cannot plausibly be considered a reasonable likelihood of competition. Concluding otherwise would effectively read the third prong out of the three-part test—it would always be possible for enough plaintiffs to join enough defendants in a single lawsuit to create sufficient mass for the court to compel the creation of a league.

Second, in this case, most of the Plaintiffs have graduated. Only two, or possibly three, remain in high school and eligible to play. And they will graduate at the end of the current school year. The Tenth Circuit has made clear that Title IX does not require the creation of a team for one talented athlete. *Roberts* 998 F.2d at 831 n.10. *A fortiori*, the court believes that Title IX does not require the creation of an entire league for two (or three) talented athletes. Given that no Title IX class has been certified, it is far from clear that the court may even order relief under Title IX that commences or continues beyond the spring of 2021, when Plaintiffs graduate. *See Cook v. Colgate University*, 922 F.2d 17, 20 (2d. Cir. 1993); *Roberts*, 998 F.2d at 834. For that matter, it is not obvious that, in the absence of a certified class, this court could appropriately compel schools where none of the Plaintiffs currently attend to create football teams—after all, if Title IX does not require the creation of a team for one talented athlete, it seems unlikely to justify the creation of a team at a school where no one seeks accommodation.

Third, even if the court ordered the creation of a league within the two Districts against whom Plaintiffs' Title IX claims remain pending, there is a real possibility that competition within this league would not satisfy the requirements of Title IX. In *Biediger v. Quinnipiac University*, the appellate court affirmed the district court's finding that competitive cheerleading

73

at the defendant university did not yet count toward its obligations under Title IX because the team did not "compete in circumstances indicative of varsity sports." 691 F.3d 85, 105 (2nd Cir. 2012). There is a distinct possibility that the same analysis would apply here. Even if the court ordered a creation of a league within the Jordan and Granite School Districts, the competition for girls tackle football teams would be markedly different from, and more limited than, competition for the Districts' other varsity sports programs and therefore might not satisfy the requirements of Title IX.[13]

Finally, the court is especially hesitant to impose such a heavy-handed remedy given that Defendants sponsor high school sports, not intercollegiate sports. The policy guidance on which Plaintiffs rely was designed for college athletics programs, which differ in significant respects from high school sports. *See* 1996 Clarification, n.1. While the policy documents make clear that their requirements apply generally to elementary and secondary programs, they do not foreclose the court from considering the unique circumstances of such programs. The court does not believe that Title IX requires high schools to be at the very vanguard of starting new sports from scratch. The court notes as well that, at least according to Dr. Monson's survey, girls tackle football is not among the top six sports not currently offered by the Districts in which girls have expressed the greatest interest. It seems especially improper to require the Districts to devote the effort and expense required to develop from scratch the only high school girls tackle football league in the country when the resources required to do so would likely come at the expense of other sports in which girls have expressed greater interest.

---

[13] For similar reasons, creating girls-only sub-varsity teams, as Plaintiffs have suggested, may be even less likely to satisfy the requirements of Title IX.

To be sure, UGTFL has grown rapidly during the brief time since it was formed, and interest in girls tackle football may well continue to develop over time. At some future point there may well be a reasonable likelihood of competition. At present, however, the court concludes that Plaintiffs have failed to establish that there is a reasonable likelihood of competition, that the Districts have a duty to create competition out of whole cloth, or that this court may appropriately order them to do so.

*     *     *

For the foregoing reasons, the court will enter judgment in the Districts' favor on Plaintiffs' Title IX claims.

### III.

Because the court would not give significant weight to Mr. Gordon's expert opinions regarding the number of players needed to sustain a team in light of his complete lack of experience coaching—and possibly even playing—high school football, and because the court's conclusion that Plaintiffs have failed to demonstrate a reasonable likelihood of competition does not turn on the number of teams required for competition, the court need not decide whether Mr. Gordon is qualified to testify as an expert. Defendants' *Daubert* motion to exclude Mr. Gordon's testimony is accordingly **DENIED AS MOOT**.

Defendants did not offer Mr. Cuff as an expert on the number of players necessary to sustain a team. And while Mr. Jackson did offer his expert opinion on this issue, he did so based on his experience—he did not rely on the study that Plaintiffs argued lay outside his expertise. And the court rejects Plaintiffs' argument that Mr. Jackson's extensive experience as a football coach and as a high school administrator responsible for supervising athletic teams is insufficient to qualify him as an expert on team size. Finally, the court's conclusion that Plaintiffs have failed

to demonstrate a reasonable likelihood of competition does not turn on the number of teams required for competition, let alone expert testimony addressing these issues. For all of these reasons, Plaintiffs' *Daubert* motion to exclude the expert testimony of Mr. Cuff and Mr. Jackson is **DENIED.**

The Districts' motion to reconsider Chief Judge Shelby's grant of summary judgment on whether the Districts have a history and continuing practice of expanding athletic opportunities for girls was not brought in a timely manner and, in all events, is moot given that the court rejects Plaintiffs' Title IX claims on other grounds. It is accordingly **DENIED.**[14]

In light of the court's ruling rejecting all of Plaintiffs' claims, Defendants' remaining motions, including the motion to decertify the class and the motions made during trial, are all **DENIED AS MOOT**.

**IT IS SO ORDERED.**

DATED this 1st day of March, 2021.

BY THE COURT:

_____

Howard C. Nielson, Jr.
United States District Judge

---

[14] Because Chief Judge Shelby's ruling is not essential to this court's ultimate judgment denying relief for Plaintiffs, and because the Districts will not be able to appeal that ruling given that they have prevailed on other grounds, the court does not anticipate that Chief Judge Shelby's ruling would be entitled to issue preclusive effect in other litigation against the Districts. *See, e.g.*, *Restatement (Second) Judgments* § 27 & cmt. h; *id.* § 28 & cmt. a.

76